[No. S126397. June 5, 2006.]

CITY AND COUNTY OF SAN FRANCISCO et al., Plaintiffs and Appellants, v.
COBRA SOLUTIONS, INC., et al., Defendants and Respondents.

840

**COUNSEL**

Dennis J. Herrera, City Attorney, Jesse C. Smith, Chief Assistant City Attorney, Therese M. Stewart, Chief Deputy City Attorney, Claire Sylvia and Ellen Forman, Deputy City Attorneys, for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Jacob Appelsmith, Assistant Attorney General, Barbara J. Seidman and Kenneth L. Swenson, Deputy Attorneys General, as Amici Curiae on behalf of Plaintiffs and Appellants.

Ann Miller Ravel, County Counsel (Santa Clara) and Lizanne Reynolds, Deputy County Counsel, for County of Santa Clara, California State Association of Counties and League of California Cities as Amici Curiae on behalf of Plaintiffs and Appellants.

Steven M. Woodside, County Counsel (Sonoma) for California State Association of Counties and League of California Cities as Amici Curiae on behalf of Plaintiffs and Appellants.

Akin Gump Strauss Hauer & Feld, Rex S. Heinke, Edward P. Lazarus and Seth M. M. Stodder for Children's Law Center of Los Angeles as Amicus Curiae on behalf of Plaintiffs and Appellants.

Keker & Van Nest, Gonzalez & Leigh, Ethan A. Balogh, G. Whitney Leigh, Nima Nami, Bryan W. Vereschagin, Rita A. Hao, Juan Enrique Pearce and Eumi K. Lee for Defendants and Respondents.

David C. Coleman, Public Defender (Contra Costa) and Ron Boyer, Deputy Public Defender, for California Public Defenders Association as Amici Curiae.

**O**PINION

**KENNARD, J.**—A company seeking contracts for information technology services to a city retained a small private law firm. Two attorneys in the firm provided various services to the company, advising it about doing business with the city. Fifteen months later, one of those attorneys successfully won election as the city attorney. Before taking office, the new city attorney announced he would personally not participate in any case involving a client of his former law firm.

Fifteen months after the new city attorney was sworn in, his office named the company as a defendant in a complaint seeking damages for the city on allegations of fraud, statutory violations, and breach of contract. The company sought to disqualify the city attorney's entire office, arguing that as its former attorney he had obtained confidential information about it that precluded him, and the public office he now headed, from representing the city against it in a matter substantially related to the city attorney's former representation of the company. The trial court disqualified the city attorney and his office. The Court of Appeal upheld that ruling in a two-to-one decision. We affirm the Court of Appeal.

## I. B**ACKGROUND**

The facts and dates recited here are drawn from declarations and exhibits submitted on the motion to disqualify and from a written contract between the City and County of San Francisco (hereafter City) and Cobra Solutions, Inc., and TeleCon Ltd., two California corporations. Cobra Solutions is in the business of providing "computer products, accessories and related professional services." On October 1, 1998, the related entities of Cobra Solutions and TeleCon Ltd. entered into a contract with the City—the so-called City Store Contract—which qualified them to bid on contracts for technology goods and services provided to various City departments, including the department of building inspection.

In September 2000, Cobra Solutions retained the law firm of Kelly, Gill, Sherburne and Herrera, seeking advice on difficulties the company had encountered in performing a City contract with the department of building inspection (Department). According to James Brady, the president and chief executive officer of Cobra Solutions, the law firm continued to represent it "in all matters" until December 2001, and it also provided legal services for TeleCon "on several occasions."

In September of 2001, then City Attorney Louise Renne began investigating contracts for computer services entered into by the Department. The investigation revealed irregularities in payments made to Marcus Armstrong, a Department employee.

On December 11, 2001, Dennis Herrera, a named partner in Kelly, Gill, Sherburne and Herrera, was elected San Francisco City Attorney (City Attorney). Herrera was sworn into office on January 8, 2002, and he adopted a blanket policy of not participating in any matter involving his former law firm or any of its clients regardless of whether he had a conflict in any particular matter. When Herrera assumed office, the City Attorney's investigation of Marcus Armstrong was already underway; results of that investigation led the City Attorney's Office to file a civil complaint on February 10, 2003, naming various defendants, including Armstrong, and alleging causes of action arising from what was characterized as a kickback scheme by which Armstrong received payments from computer service providers for services they never performed.

On the same day the complaint was filed the City Attorney's office issued a press release under the heading, "HERRERA NAMES TOP BUILDING DEPARTMENT OFFICIAL, TECHNOLOGY VENDORS IN MAJOR PUBLIC CORRUPTION SUIT." In that press release, City Attorney Herrera denounced "Mr. Armstrong and his cronies" for betraying "a public trust," and asserted that "[p]ublic corruption diminishes the confidence of our citizens in their government." According to the press release, the lawsuit was the product of "a yearlong investigation by the City Attorney's Public Integrity Task Force," which Herrera created on taking office and which he described as a "vehicle for civil law enforcement enabling us to aggressively pursue those who would violate the public trust."

Because the allegations in the City's lawsuit implicated Armstrong in possible criminal misconduct, the City Attorney's Office referred the matter to the United States Attorney for the Northern District of California. The federal prosecutor filed criminal charges against Armstrong, who later pleaded guilty to federal charges of mail fraud, wire fraud, and obstruction of justice.

In March 2003, the City's investigators discovered that Armstrong had deposited more than $240,000 in checks from Cobra Solutions into the bank account of a fictitious business entity he created. When City Attorney Herrera learned that the investigation implicated his former client Cobra Solutions in the kickback scheme, he took measures to screen himself from the case to the extent that it could involve the former client. To maintain the ethical screen, attorneys working on the case were directed to report to Chief Assistant City Attorney Jesse Smith and not to discuss the case with Herrera. Those attorneys maintained locked files and computerized records that were inaccessible to Herrera.

On April 21, 2003, the City filed an amended complaint adding Cobra Solutions and TeleCon Ltd. as defendants. In addition to causes of action for

fraud, unfair competition, and false claims that the complaint alleged against all defendants, it also alleged causes of action against Cobra Solutions and TeleCon Ltd.[1] for negligent misrepresentation and contractual claims arising from breach of the City Store contract.

Cobra moved to disqualify from the litigation its former counsel Herrera and the City Attorney's Office he heads. In support of the motion, Cobra submitted a bill dated April 13, 2001, showing a charge of four-tenths of an hour attributable to Herrera's "[r]eview of City Store contract document." Cobra's president asserted that he and his employees disclosed to Gill and to Herrera "confidential aspects of Cobra's business" in the course of a representation that was "broad" enough to include "advocacy with City officials," review of contracts, advice on corporate structure, and drafting of standard agreements, forms, and policies. After a hearing, the trial court granted Cobra's disqualification motion, finding that City Attorney Herrera, while in private practice, had personally represented defendants, and that during that representation he had "obtained confidential information" regarding "matters related substantially to the issues raised against defendants in this litigation." The trial court concluded that Herrera's conflict must be imputed to the entire City Attorney's Office because "the personally-conflicted counsel is the head" of that office, and "each of his deputies serves at his pleasure," subjecting them "necessarily to his oversight and influence." Accordingly, the trial court ordered the City to "retain outside independent counsel to litigate this matter." The City Attorney appealed.

In a two-to-one decision, the Court of Appeal upheld the trial court's ruling. It concluded that when "an attorney leaves private practice to become the *head* of a public law office" the "vicarious disqualification of the entire public law office generally is required in all matters substantially related to the head of the office's earlier private representations." The dissenting justice saw no need to recuse the entire government law office as long as the personally conflicted City Attorney had been shielded by an "effective ethical screen." The majority rejected that view, but it acknowledged the existence of "sound reasons" against automatically imputing the conflict of one attorney to an entire government law office. Because it was unnecessary to reach the issue, the majority expressly refrained from deciding whether an ethical screen might suffice to avoid office-wide disqualification when a conflicted attorney comes from private practice into a government law office to assume a *subordinate* post, but it held that when, as here, the conflicted attorney

---

[1] Cobra Solutions and TeleCon Ltd. are apparently related entities, both were represented by Herrera's law firm, and both brought the motion to disqualify; for convenience we refer to them collectively as Cobra.

serves as chief executive of the government law office, disqualification of the entire office is necessary. Given the importance of these issues, we granted review.

## II.   RELEVANT LAW

■   The authority of a trial court "to disqualify an attorney derives from the power inherent in every court '[t]o control in furtherance of justice, the conduct of its ministerial officers.' " (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1145 [86 Cal.Rptr.2d 816, 980 P.2d 371] (*SpeeDee*), quoting Code Civ. Proc., § 128, subd. (a)(5).) "Ultimately, disqualification motions involve a conflict between the clients' right to counsel of their choice and the need to maintain ethical standards of professional responsibility." (*SpeeDee,* at p. 1145.) As we have explained, however, "[t]he paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar." (*Ibid.*)

■   When disqualification is sought because of an attorney's successive representation of clients with adverse interests, the trial court must balance the current client's right to the counsel of its choosing against the former client's right to ensure that its confidential information will not be divulged or used by its former counsel.

■   Two ethical duties are entwined in any attorney-client relationship. First is the attorney's duty of confidentiality, which fosters full and open communication between client and counsel, based on the client's understanding that the attorney is statutorily obligated (Bus. & Prof. Code, § 6068, subd. (e)) to maintain the client's confidences. (*SpeeDee, supra,* 20 Cal.4th at p. 1146.) The second is the attorney's duty of undivided loyalty to the client. (*Flatt v. Superior Court* (1994) 9 Cal.4th 275, 282 [36 Cal.Rptr.2d 537, 885 P.2d 950] (*Flatt*).) These ethical duties are mandated by the California Rules of Professional Conduct. (Rules Prof. Conduct, rule 3-310(C) & (E).)

■   The interplay of the duties of confidentiality and loyalty affects the conflict of interest rules that govern attorneys. An attorney who seeks to simultaneously represent clients with directly adverse interests in the same litigation will be automatically disqualified. (*Flatt, supra,* 9 Cal.4th at p. 284, fn. 3.) Moreover, an attorney may not switch sides during pending litigation representing first one side and then the other. (*City of Santa Barbara v. Superior Court* (2004) 122 Cal.App.4th 17, 23 [18 Cal.Rptr.3d 403].) That is true because the duty to preserve client confidences (Bus. & Prof. Code, § 6068, subd. (e)) survives the termination of the attorney's representation. (*SpeeDee, supra,* 20 Cal.4th at p. 1147.)

■ That enduring duty to preserve client confidences precludes an attorney from later agreeing to represent an adversary of the attorney's former client unless the former client provides an "informed written consent" waiving the conflict. (Rules Prof. Conduct, rule 3-310(E).) If the attorney fails to obtain such consent and undertakes to represent the adversary, the former client may disqualify the attorney by showing a " 'substantial relationship' " between the subjects of the prior and the current representations. (*Flatt, supra,* 9 Cal.4th at p. 283.) ■ To determine whether there is a substantial relationship between successive representations, a court must first determine whether the attorney had a direct professional relationship with the former client in which the attorney personally provided legal advice and services on a legal issue that is closely related to the legal issue in the present representation. (*Jessen v. Hartford Casualty Ins. Co.* (2003) 111 Cal.App.4th 698, 710–711 [3 Cal.Rptr.3d 877].) If the former representation involved such a direct relationship with the client, the former client need not prove that the attorney possesses actual confidential information. (*Id.* at p. 709.) Instead, the attorney is presumed to possess confidential information if the subject of the prior representation put the attorney in a position in which confidences material to the current representation would normally have been imparted to counsel. (*Flatt, supra,* 9 Cal.4th at p. 283; *Adams v. Aerojet-General Corp.* (2001) 86 Cal.App.4th 1324, 1332 [104 Cal.Rptr.2d 116]; *H. F. Ahmanson & Co. v. Salomon Brothers, Inc.* (1991) 229 Cal.App.3d 1445, 1453–1454 [280 Cal.Rptr. 614].) When the attorney's contact with the prior client was not direct, then the court examines both the attorney's relationship to the prior client and the relationship between the prior and the present representation. If the subjects of the prior representation are such as to "make it likely the attorney acquired confidential information" that is relevant and material to the present representation, then the two representations are substantially related. (*Jessen v. Hartford Casualty Ins. Co., supra,* 111 Cal.App.4th at p. 711; see *Farris v. Fireman's Fund Ins. Co.* (2004) 119 Cal.App.4th 671, 680 [14 Cal.Rptr.3d 618] [material confidential information is that which is "directly at issue in" or has "some critical importance to, the second representation"].) When a substantial relationship between the two representations is established, the attorney is automatically disqualified from representing the second client. (*Flatt, supra,* 9 Cal.4th at p. 283; see Hazard and Hodes, The Art of Lawyering (3d ed. 2000 & 2005-2 supp.) § 13.5, pp. 13-12–13-13.)

■ Although the rules governing the ethical duties that an attorney owes to clients are set out in the California Rules of Professional Conduct, those rules do not address when an attorney's personal conflict will be imputed to the attorney's law firm resulting in its vicarious disqualification. Vicarious disqualification rules are a product of decisional law. (*Henriksen v. Great American Savings & Loan* (1992) 11 Cal.App.4th 109, 114 [14 Cal.Rptr.2d 184].) Normally, an attorney's conflict is imputed to the law firm as a whole

on the rationale "that attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information." (*SpeeDee, supra*, 20 Cal.4th at pp. 1153–1154, fn. omitted.) Here we consider whether the judicially created rule requiring vicarious disqualification of an entire law firm should apply to a government law office when the head of that office has a conflict because that attorney previously, while in private practice, represented a client that is now being sued by the government entity in a matter substantially related to the attorney's prior representation.

## III. ANALYSIS

The trial court found, and it is undisputed here, that City Attorney Herrera had a conflict based on his having previously represented, in private practice, the Cobra defendants "during which representation he obtained confidential information" from them "in matters related substantially to the issues raised against [them] in this litigation." The trial court further found that each of the City Attorney's deputies "serves at [the] pleasure" of the City Attorney and thus "is subject necessarily to his oversight and influence."

"Generally, a trial court's decision on a disqualification motion is reviewed for abuse of discretion. [Citations.] If the trial court resolved disputed factual issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence. [Citations.] When substantial evidence supports the trial court's factual findings, the appellate court reviews the conclusions based on those findings for abuse of discretion. [Citation.] However, the trial court's discretion is limited by the applicable legal principles. [Citation.] Thus, where there are no material disputed factual issues, the appellate court reviews the trial court's determination as a question of law. [Citation.]" (*SpeeDee, supra*, 20 Cal.4th at pp. 1143–1144.) Here there is no factual dispute, and we review independently the Court of Appeal's legal conclusion that the City Attorney's personal conflict is properly imputed to the Office of the City Attorney and requires its disqualification.

The City contends that the vicarious disqualification of its entire city attorney's office is neither compelled nor justified by prior court decisions involving government law offices. It relies on *People v. Christian* (1996) 41 Cal.App.4th 986 [48 Cal.Rptr.2d 867] (*Christian*). There the Court of Appeal held there was no actual conflict when two attorneys, both supervised by the Contra Costa County Public Defender, in a joint trial represented two criminal codefendants who had potentially conflicting interests. (*Id.* at p. 1001.) The public defender oversaw two independent government law offices—the public defender's office and an alternate defender's office. (*Id.* at

p. 992.) Although the public defender was the titular head of the alternate defender's office, he did not supervise or evaluate alternate defender attorneys, did not initiate their promotion or discipline, and he had no access to its client files or confidences. (*Id.* at pp. 992–993, 999.) Concluding that the organization and operation of the two defenders' offices made them, in effect, separate law firms (see Rules Prof. Conduct, rule 1-100(B)(1)(d) ["law firm" includes "a publicly funded entity which employs more than one lawyer to perform legal services"]), the Court of Appeal rejected the view that the simultaneous representation of codefendants by the public defender and the alternate defender created a conflict, because the county public defender was also the titular head of the alternate defender's office. (*Christian, supra,* at p. 1000.) Given the public defender's limited control of the alternate defender's office in *Christian*, we reject the City's argument that the attorneys in *Christian* were "attorneys within the *same* government office."

In an analogous case, *Castro v. Los Angeles County Bd. of Supervisors* (1991) 232 Cal.App.3d 1432 [284 Cal.Rptr. 154] (*Castro*), a single executive director headed a nonprofit corporation with three separate public law units providing service to parents and children in dependency proceedings. The Court of Appeal in *Castro* concluded that there would be no conflict if attorneys from each unit were to simultaneously represent clients from a single family whose interests were divergent. (*Id.* at pp. 1439, 1441–1444.) In *Castro* the autonomy of each law unit was ensured because the chief attorney in each unit initiated hiring, firing, and salary changes for that unit's attorneys. (*Id.* at p. 1438.) In both *Castro* and *Christian, supra,* 41 Cal.App.4th 986, the separate law units under a single governmental umbrella operated as separate law firms independent of parallel units also sheltered under that umbrella. Both *Castro* and *Christian* addressed conflicts arising from simultaneous representation, unlike the *successive* representation conflict before us. But both cases were decided in the wake of the Court of Appeal's decision in *Younger v. Superior Court* (1978) 77 Cal.App.3d 892 [144 Cal.Rptr. 34] (*Younger*).

*Younger* was a successive representation case in which the Court of Appeal upheld the disqualification of the entire Los Angeles County District Attorney's Office in the prosecution of a criminal defendant. (*Younger, supra,* 77 Cal.App.3d at pp. 896–897.) The defendant had been represented by the law firm of Johnnie L. Cochran, Jr., who was later appointed assistant district attorney, making him one of "three top executives" supervising "more than 550" deputy attorneys. (*Id.* at pp. 894–895.) When Cochran assumed his new post, the district attorney's office adopted procedures designed to screen

Cochran from making crucial decisions, such as whether to settle a case, or whether to seek the death penalty in a capital case, whenever it involved a defendant formerly represented by the Cochran law firm. (*Id.* at p. 895, fn. 3.)

Notwithstanding the ethical screen erected between Cochran and the prosecution of defendants formerly represented by his law firm, the Court of Appeal upheld the vicarious disqualification of the entire Los Angeles County District Attorney's Office. It noted that Cochran's "presence" in a job "near the top" of the office's hierarchy "could possibly affect" the office's prosecution of his firm's former clients. (*Younger, supra,* 77 Cal.App.3d at p. 897.) Pointing specifically to Cochran's role in formulating prosecutorial policies, it expressed concern that even seemingly unrelated policy decisions could impact the prosecution of these cases. (*Ibid.*) In addition, Cochran's role in the appraisal and promotion of deputies necessarily required him to evaluate the performance of deputies prosecuting his firm's former clients. The Court of Appeal explained: "A deputy handling one or more of such cases would not in all probability forget Cochran's former professional association" with the defense of those cases. (*Ibid.*) Even absent any impropriety, the Court of Appeal cautioned, public perception of the prosecutor's integrity and impartiality would be at risk unless the entire office was disqualified. (*Ibid.*)

The disqualification standard that the Court of Appeal applied in *Younger* no longer controls *criminal* prosecutions because the Legislature in 1980 enacted Penal Code section 1424 (Stats. 1980, ch. 780, § 1, p. 2373), which provides for the recusal of local prosecuting agencies only when "the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." (Pen. Code, § 1424, subds. (a)(1) & (b)(1).) Section 1424 is inapplicable to this case, which is a civil action. Although the statute, which triggers disqualification of a prosecutor from a criminal proceeding "only if" the conflict is " 'so grave as to render it unlikely that [the] defendant will receive fair treatment' " (*People v. Griffin* (2004) 33 Cal.4th 536, 569 [15 Cal.Rptr.3d 743, 93 P.3d 344]), has superseded *Younger*'s holding (see *People v. Conner* (1983) 34 Cal.3d 141, 147 [193 Cal.Rptr. 148, 666 P.2d 5]), the concerns that the Court of Appeal in *Younger* expressed about conflicted heads of public law offices, whose policymaking and supervisory duties are such as to preclude them from being effectively screened, have not lost their relevance.[2]

---

[2] We do not decide, because the issue is not before us, whether ethical screening might suffice to shield a senior supervisory attorney with a personal conflict and thus avoid vicarious disqualification of the entire government legal unit under that attorney's supervision. In ruling on such a motion, the trial court should undertake a factual inquiry into the actual duties of the supervisor with respect to those attorneys who will be ethically screened and to the supervisor's responsibility for setting policies that might bear on the subordinate attorneys' handling of the litigation. In addition, the trial court should consider whether public awareness of the

As this court has explained in the past, there are both societal and personal interests at stake when an attorney and the attorney's private or public law firm is disqualified. (*SpeeDee, supra*, 20 Cal.4th at p. 1145.) The societal interests at stake include preserving high ethical standards for every attorney, each of whom is obliged to preserve client confidences and whose failure to do so undermines public confidence in the judicial system. (*Ibid.*) Attorneys who head public law offices shoulder additional ethical obligations assumed when they become public servants. They possess "such broad discretion" that the public "may justifiably demand" that they exercise their duties consistent "with the highest degree of integrity and impartiality, and with the appearance thereof." (*People v. Superior Court (Greer)* (1977) 19 Cal.3d 255, 266–267 [137 Cal.Rptr. 476, 561 P.2d 1164] [disqualification of conflicted district attorney].)

Vicarious disqualification also has an impact on the personal interests of a conflicted attorney's current and former clients. Current clients have a right to retain their chosen counsel, and they will bear the financial burden when their chosen counsel is disqualified—a burden that an opponent may desire in order to gain a tactical advantage in the litigation. (*SpeeDee, supra*, 20 Cal.4th at p. 1145.) With respect to former clients, they have an overwhelming interest in preserving the confidentiality of information they imparted to counsel during a prior representation. That interest is imperiled when counsel later undertakes representation of an adversary in a matter substantially related to counsel's prior representation of the former client.

The burdens of disqualification are heavy both for private sector and public sector clients. When an entire government law office is disqualified, the government inevitably incurs the added cost of retaining private counsel (*In re Lee G.* (1991) 1 Cal.App.4th 17, 28 [1 Cal.Rptr.2d 375]), the delay such substitution entails, and in certain types of litigation it may also lose the specialized expertise of its in-house attorneys, hampering its ability to protect the public's interest. (See, e.g., *City of Santa Barbara v. Superior Court, supra*, 122 Cal.App.4th at p. 23, fn. 1 [city attorney's office possessed specialized expertise in the law of sewer construction and maintenance].) Greater legal costs caused by hiring private sector attorneys raise the specter "that litigation decisions will be driven by financial considerations," not by the public interest. (*Id.* at p. 25.) And when a government law office is disqualified, the expense of that disqualification is ultimately paid by the taxpayers.

---

case, or the conflicted attorney's role in the litigation, or another circumstance is likely to cast doubt on the integrity of the governmental law office's continued participation in the matter.

Other burdens caused by vicarious disqualification are cited by the Attorney General, appearing as amicus curiae on behalf of the City.[3] He argues that office-wide disqualification hampers recruiting by government law offices of " 'the most promising class of young lawyers.' " (*Chambers v. Superior Court* (1981) 121 Cal.App.3d 893, 900 [175 Cal.Rptr. 575].) He further asserts that vicarious disqualification impugns the integrity of government attorneys by implicitly assuming they will violate the confidences of former clients.

Citing these burdens on government, both the City and its amicus curiae, the Attorney General, urge us to hold that whenever a conflicted attorney enters government service, that attorney's conflict should not result in vicarious disqualification of the government law office the attorney joins. Instead, they argue, screening the conflicted attorney from matters involving the attorney's former clients—such as the screening of the City Attorney that occurred here—will suffice to protect client confidentiality.

Ethical screening is the approach adopted by the American Bar Association (ABA), whose Model Rules of Professional Conduct require "a lawyer currently serving as a public officer or employee" not to "participate in a matter in which the lawyer participated personally and substantially while in private practice." (ABA Model Rules Prof. Conduct, rule 1.11(d)(2)(i).) Indeed, the ABA Model Rules have long included rules specifically directed to government lawyers and to their conflicts arising from successive representation. As the comment to rule 1.11(d) explains, "[b]ecause of the special problems raised by imputation within a government agency," the rule "does not impute the conflicts of a lawyer currently" in government service "to other associated government" lawyers, "although ordinarily it will be prudent to screen such lawyers." (*Id.*, com. [2].) Thus, under the ABA Model Rules the taint of a conflicted attorney who moves into government employment is not imputed to the government law office in which the attorney now practices. (See Hazard & Hodes, The Art of Lawyering, *supra*, § 14.5, p. 14-13; *id.*, § 15.3, p. 15-10 ["[W]oodenly applying the automatic imputation rule that usually governs private law firms would be impractical and against the public interest."].)

California has not adopted the ABA Model Rules (*General Dynamics Corp. v. Superior Court* (1994) 7 Cal.4th 1164, 1190, fn. 6 [32 Cal.Rptr.2d 1, 876 P.2d 487]), although they may serve as guidelines absent on-point California authority or a conflicting state public policy (*State Comp. Ins. Fund v. WPS, Inc.* (1999) 70 Cal.App.4th 644, 656 [82 Cal.Rptr.2d 799]).

---

[3] The Attorney General argues in favor of screening with "ethical walls to avoid conflicts" within government offices in general, but he expressly has taken no position on the ethical screening the City Attorney's Office in this case used to screen the City Attorney from his deputies.

California, in contrast to the ABA, has not adopted separate Rules of Professional Conduct applicable to government lawyers, but it has addressed government law office conflict problems through judicial decisions.

■ When an attorney leaves private practice for a government law office, California courts have upheld the ethical screening of that attorney within the government office to protect confidences the attorney obtained from the former client in a prior representation. For example, in *City of Santa Barbara v. Superior Court, supra*, 122 Cal.App.4th 17, an attorney while in private practice represented a homeowner until the attorney left her law firm to join a municipal law office that was litigating the same case against the attorney's former client. The Court of Appeal upheld an ethical screen isolating the incoming attorney and permitting the municipal law office to continue representing the city. (*Id.* at pp. 26–27.) And in *Chadwick v. Superior Court* (1980) 106 Cal.App.3d 108 [164 Cal.Rptr. 864], an attorney in a county public defender's office left to join the local district attorney's office, where he was ethically screened from any involvement with his prior cases. The Court of Appeal concluded that the attorney's personal conflict should not be imputed to disqualify the entire district attorney's office. (*Id.* at pp. 116–119.) In both these cases, however, the attorney who was subject to ethical screening was simply one of the attorneys in the government office, not, as here, the City Attorney under whom and at whose pleasure all deputy city attorneys serve.

Justifications that the City here advances for ethical screening instead of disqualification of the entire City Attorney's office appear overstated. Like the Court of Appeal majority, we are not persuaded that competent attorneys in private practice will be discouraged from running for or seeking appointment to posts such as city attorney because their prior private representations might result in disqualification of the entire city attorney's office. Moreover, it is possible that a specific candidate's potential for causing vicarious disqualification of the city attorney's office could legitimately become a campaign issue. If so, the city's citizens who will pay for hiring outside counsel will be able to make an informed choice at the polls. Typically such government law offices litigate many cases, and office-wide disqualification from one case is unlikely to significantly impair the office's overall operations. That is certainly so here, where the City Attorney's role in advising City agencies is at least as great as his role in litigating on behalf of the City.

Individuals who head a government law office occupy a unique position because they are ultimately responsible for making policy decisions that determine how the agency's resources and efforts will be used. Moreover, the attorneys who serve directly under them cannot be entirely insulated from those policy decisions, nor can they be freed from real or perceived concerns

as to what their boss wants. The power to review, hire, and fire is a potent one. Thus, a former client may legitimately question whether a government law office, now headed by the client's former counsel, has the unfair advantage of knowing the former client's confidential information when it litigates against the client in a matter substantially related to the attorney's prior representation of that client.

There is another reason to require the disqualification of the conflicted head of a government law office. That reason arises from a compelling societal interest in preserving the integrity of the office of a city attorney. It is beyond dispute that the citizens of a city are entitled to a city attorney's office that unreservedly represents the city's best interests when it undertakes litigation. Public perception that a city attorney and his deputies might be influenced by the city attorney's previous representation of the client, at the expense of the best interests of the city, would insidiously undermine public confidence in the integrity of municipal government and its city attorney's office.

It was a cruel irony that City Attorney Herrera, who on assuming office avowedly undertook to fight public corruption, later learned that a client that he had represented while in private practice was an apparent participant in a kickback scheme designed to defraud the City. We have no reason whatsoever to believe that City Attorney Herrera knew of or suspected his former client Cobra's possible involvement in the scheme as of February 10, 2003, when the City filed its original complaint. Nonetheless, for the reasons explained in this opinion, not only the City Attorney but his entire office must in this case be disqualified.

### DISPOSITION

The judgment of the Court of Appeal upholding the disqualification of the Office of the City Attorney of San Francisco is affirmed.

Baxter, J., Chin, J., Moreno, J., and Epstein, J.,* concurred.

**CORRIGAN, J.,** Dissenting.—Must an entire government law office be disqualified whenever the office head has a conflict because he or she previously represented a client in private practice? Disqualification would certainly be appropriate in some circumstances, but I do not agree it should be automatic. In my view, such a rigid rule needlessly burdens the public. Sound public policy considerations weigh against automatic disqualification.

---

*Presiding Justice, Court of Appeal, Second Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6, of the California Constitution.

These considerations include the cost of employing outside counsel, which may cause some government law offices to forgo meritorious cases; the concern that similar cases reflecting a general policy could be handled inconsistently; and the disincentive for top-level private practitioners to seek, and for voters to elect them to, positions as leaders of government law offices. I would allow the trial court to determine on a case-by-case basis the adequacy of the screening procedures undertaken by the government law office. In exercising its discretionary review, the trial court should consider all relevant factors, including the degree of involvement of the office head with the former client,[1] the size of the government law office, and the nature of the current suit.

The automatic disqualification rule arose in the context of private practice, at a time when it was relatively uncommon for attorneys to move from one firm to another. Thus, the rule's burdens were relatively light. Now, however, attorney mobility and firm mergers have increased exponentially. Accordingly, the automatic disqualification rule is being questioned even in the private practice context. "The vicarious disqualification of an entire firm can work harsh and unjust results, particularly in today's legal world where lawyers change associations more freely than in the past. A rule that automatically disqualifies a firm in all cases substantially related to the tainted lawyer's former representation could work a serious hardship for the lawyer, the firm and the firm's clients. . . . [¶] . . . [¶] We would nevertheless accept the costs of automatic disqualification, if it were the only way to ensure that lawyers honor their duties of confidentiality and loyalty. But it is not. A client's confidences can also be kept inviolate by adopting measures to quarantine the tainted lawyer. An ethical wall, when implemented in a timely and effective way, can rebut the presumption that a lawyer has contaminated the entire firm. . . . [¶] . . . [¶] The changing realities of law practice call for a more functional approach to disqualification than in the past." (*In re County of Los Angeles* (9th Cir. 2000) 223 F.3d 990, 996 (maj. opn. by Kozinski, J.).)

The question whether the disqualification of an attorney should be imputed to the entire government legal office that lawyer joins has been addressed by the American Bar Association (ABA) in a formal ethics opinion. The ABA declined to extend the automatic disqualification rule because "the government's ability to function would be unreasonably impaired." (ABA, Com. on Ethics & Prof. Responsibility, Formal Opn. No. 342 (1975).) The ABA explained, "The relationships among lawyers within a government agency are different from those among partners and associates of a law firm. The salaried government employee does not have the financial interest in the success of

---

[1] The fact that Mr. Herrera billed Cobra Solutions, Inc. for only 24 minutes of his time (maj. opn., *ante*, at p. 845) suggests that his degree of involvement with the "City Store" contract was minimal.

departmental representation that is inherent in private practice. The important difference in the adversary posture of the government lawyer is recognized by Canon 7: the duty of the public prosecutor to seek justice, not merely to convict, and the duty of all government lawyers to seek just results rather than the result desired by a client. The channeling of advocacy toward a just result as opposed to vindication of a particular claim lessens the temptation to circumvent the disciplinary rules through the action of associates. . . . Although vicarious disqualification of a government department is not necessary or wise, the individual lawyer should be screened from any direct or indirect participation in the matter, and discussion with his colleagues concerning the relevant transaction or set of transactions is prohibited by those rules." (*Ibid.*)

The majority correctly observes that California has not adopted the ABA Model Rules of Professional Conduct. (Maj. opn., *ante*, at p. 852.) However, the public policy considerations relied upon by the ABA are persuasive, and a leading text confirms that the ABA's position is well accepted throughout the country. "[ABA] Model Rule 1.10(a) and most comparable state rules do *not* impute an individual *government* lawyer's disqualification *to* all other members of this special kind of 'firm.' . . . [¶] . . . [W]oodenly applying the automatic imputation rule that usually governs private law firms would be impractical and against the public interest. A government legal department—unlike a private firm—cannot simply forgo litigating certain cases. Thus, if the ordinary imputation rules applied, the department would either have to select lawyer-employees with limited prior legal experience, or expend money hiring special counsel to litigate the affected cases" (1 Hazard & Hodes, The Law of Lawyering (3d ed. 2005 supp.) § 15.3, p. 15-10, fn. omitted.)

In California, case law extending the automatic disqualification rule to prosecutors' offices was nullified by the Legislature. In *Younger v. Superior Court* (1978) 77 Cal.App.3d 892 [144 Cal.Rptr. 34], the Court of Appeal disqualified an entire district attorney's office because of an *appearance of impropriety* created by the fact that a newly appointed supervising district attorney had once been a member of the firm representing the defendant. In response to *Younger* and other cases, the Legislature enacted Penal Code section 1424. (*People v. Eubanks* (1996) 14 Cal.4th 580, 591 [59 Cal.Rptr.2d 200, 927 P.2d 310].) Under that provision, a district attorney or a city attorney may not be disqualified unless the evidence establishes a conflict of interest that would render a fair trial unlikely. The majority correctly notes that section 1424 does not apply in a civil action. (Maj. opn., *ante*, at p. 850.) However, as we attempt to balance competing public policies we should not

ignore the balance struck by the Legislature in section 1424. Certainly, the interest in evenhanded administration of justice is at least as weighty in a criminal case, where life or liberty is at stake, as it is in a civil action for monetary damages.

For the reasons stated, I would reverse the judgment of the Court of Appeal upholding the disqualification of the Office of the City Attorney of San Francisco.

George, C. J., concurred.