Filed 12/7/21  PlanNet Consulting v. McNary CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| PLANNET CONSULTING, LLC, Plaintiff and Respondent, v. DANIEL MCNARY et al., Defendants and Appellants. | G059474 (Super. Ct. No. 30-2018-01033841) O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Glenn R. Salter, Judge.  Affirmed.

Law Offices of Scott L. Dahle and Scott L. Dahle for Defendants and Appellants.

K & L Law Group and Marc Y. Lazo, for Plaintiff and Respondent.

*          *          *

Defendants and cross-complainants Daniel McNary and MC Constructors, Inc. (collectively defendants), appeal from the trial court's order disqualifying their counsel from the litigation underlying this appeal. Substantial evidence supports the court's factual finding that counsel, through a prior transactional representation of the limited liability company plaintiff in this litigation, developed an intimate knowledge of the plaintiff's operations, and a substantial relationship exists between counsel's prior representation of the plaintiff and current representation of the defendants. Accordingly, we affirm the court's disqualification order.

I

FACTUAL AND PROCEDURAL BACKGROUND

A. *Representations by Counsel*

According to its verified complaint in this case, plaintiff PlanNet Consulting, LLC (the LLC), and its affiliates provide professional services for "information [and] operational technology planning, design, implementation, operations and optimization, and [] critical facility planning, design[] and construction." In 2012, through its managing principal Steve Miano, the LLC entered a joint venture with defendant Daniel McNary called PlanNet Design & Construction, Inc. (the corporation), to operate a data center construction business and "act as the construction contractor for [the LLC's] jobs." During this period, Miano and McNary collectively owned the majority of the LLC's membership interests and also were co-equal owners of all of the corporation's shares.

In the summer of 2016, McNary introduced Miano to the attorney who was disqualified in this case: Scott Dahle. One month later, Miano and Dahle signed an agreement for Dahle to provide services as a "team leader with respect to all aspects of the potential" acquisition of a third party technology company not involved in this litigation. Although Miano's signature section ambiguously indicated he was executing the agreement on behalf of "PlanNet"—i.e., without specifying whether the name meant

2

the LLC or the corporation—the agreement broadly stated in its first sentence that Dahle would provide "consulting and advisory services to PlanNet, and its subsidiaries, and/or affiliates."

The "[s]cope" section of the retainer agreement listed 24 categories of service Dahle would provide. They included "[l]egal, . . . [p]roviding general legal, financial, and investment banking consultation services, [and] . . . [a]ssisting in preparation of any private placement memoranda, prospectuses, investor presentations, or other offering documents deemed necessary." It is undisputed that after signing the agreement, Dahle performed due diligence for the corporation's possible acquisition of the technology company, revised the LLC's articles of organization, and, for entities under the "umbrella" of the corporation, "suggested and provided a set of bylaws to be used by all corporate entities for purposes of consistency." Dahle ultimately recommended against acquiring the company and, according to the defendants, ceased his "formal association with" the corporation around February 2017.

At the time the 2016 retainer agreement was signed, Miano had taken a leave of absence from the corporation and, in his place, McNary was serving as an interim chief executive officer. When Miano returned in late 2017, he accused McNary of mismanaging the corporation. In March 2018, McNary retained Dahle to represent him in his business dispute with Miano. Two months later, McNary and Dahle came to a board of director's meeting for the corporation where McNary's employment termination was to be discussed. Miano was also there with his counsel, who objected to Dahle's representation of McNary based on Dahle's earlier representation of the LLC. Nothwithstanding that objection, the parties continued their discussions with Dahle's participation; the following month, the LLC, the corporation, Miano, and McNary formalized a termination of their business relationships through two documents signed on the same day: a settlement agreement and an intellectual property licensing agreement.

3

The settlement agreement provided that Miano would receive all of McNary's interests in the LLC and McNary would own all interests in the corporation. The related licensing agreement stated it was being entered into to "permit [a] transition and rebranding" of the corporation, and established the LLC's intellectual property would be licensed to the corporation for six months, by which time the corporation was to be renamed to "something unrelated to 'PlanNet' [ i.e., the LLC]."

Five months after signing the licensing agreement, in November 2018, McNary publicly announced "Constructiv" as a new "brand name" for the corporation. The announcement rhetorically asked "Why did we make the switch from PlanNet Design & Construction to Constructiv?" and repeated: "PlanNet is now Constructiv!"

B. *The Current Litigation*

The following month, the LLC filed a lawsuit against McNary and the corporation,[1] alleging the following 11 causes of action: (1) breach of contract (on the settlement agreement); (2) breach of the implied covenant of good faith and fair dealing (on the settlement agreement); (3) breach of contract (on the license agreement); (4) breach of the implied covenant of good faith and fair dealing (on the license agreement); (5) intentional interference with prospective economic advantage; (6) negligence; (7) trade name infringement; (8) dilution of mark; (9) false advertising; (10) unfair competition; and (11) conversion.[2] All causes of action either rest on or include a theory that McNary and the corporation either intentionally or negligently advertised "Constructiv" to induce and encourage the LLC's clients and related parties to

---

[1] Other named codefendants are not parties to this appeal.

[2] Although the complaint lists a 12th cause of action entitled "preliminary and permanent injunctions," its allegations only amount to a request for a remedy and not a cause of action. (*Marlin v. Aimco Venezia, LLC* (2007) 154 Cal.App.4th 154, 162.)

4

seek services from Constructiv instead of the LLC.  In its request for relief, the LLC seeks, among other things, injunctive relief and money damages.

Dahle filed answers for McNary and the corporation, which now identifies itself through a new name:  MC Constructors, Inc.[3]  Dahle also filed on behalf of the defendants a cross-complaint against the LLC and Miano; that cross-complaint is not at issue in this appeal.

C.  *The Motion to Disqualify Counsel*

The LLC filed a motion to disqualify Dahle from representing defendants in this litigation, asserting Dahle had acted as the LLC's counsel under the 2016 retainer agreement and learned its confidential information.  Specifically, the LLC asserted Dahle obtained the LLC's "confidential and proprietary information . . . including but not limited to [its] risk tolerance, business culture, . . . financial condition, . . . litigation strategies . . . , plans for expansion, . . . marketing strategies, [and ]insurance holdings."

The defendants initially filed an opposition arguing Dahle had "performed no legal services on behalf" of the LLC.  The parties  submitted further briefing and documents, including a declaration by the LLC's president, Andrew Harrod, summarizing the LLC's e-mail communications in which Dahle had been involved, and attaching copies of 45 e-mails as examples of various legal matters about which Dahle had communicated.  Harrod asserted his review of the LLC's internal system showed Dahle had been privy to over 18,000 LLC e-mails, through Dahle's LLC e-mail address.

In their supplemental brief, the defendants conceded that Dahle had provided legal services to the LLC by drafting "amended articles of organization" for the LLC, which had been discussed in some of Harrod's attached e-mail exhibits.  Through a declaration, Dahle also explained that some of the e-mails dealt with bylaws he had

---

[3]  All further references to the corporation include the business MC Constructors, Inc., formerly known as PlanNet Design & Construction, Inc., based on the defendants' briefing.

"suggested and provided," to "bring consistency to the many disparate companies created under the umbrella of" the corporation. The defendants maintained Dahle should not be disqualified, however, because there was no substantial relationship between his services and the present litigation underlying this appeal.

The trial court granted the LLC's motion to disqualify Dahle. The court found Dahle's 2016 retainer agreement "contemplated he would, among other things, perform legal services for the [LLC]," and that he "provided some non-litigation legal services that" were "interwined" with "the provision of business services to the [LLC]." The court also found "Dahle was a major player in the business side of [the LLC], both in the development of the business as well as its operations," and had "an intimate knowledge of how [the LLC] operates." The court reasoned the knowledge was "of unusual value in this case" and would "inform the settlement agreement's interpretation, application, and understanding." The trial court did not err in reaching this result. (*Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1451 [reviewing court generally affirms or reverses based on the correctness of the results and not their reasons]).

II

DISCUSSION

A. *Standard of Review*

We review a trial court's ruling to disqualify counsel for abuse of discretion. "If the trial court resolved disputed factual issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence. [Citations.] When substantial evidence supports the trial court's factual findings, the appellate court reviews the conclusions based on those findings for abuse of discretion. [Citation.] However, the trial court's discretion is limited by the applicable legal principles." (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1143-1144.)

6

B. *Attorney Disqualification Principles and the Substantial Relationship Test*

The authority of a trial court "'to disqualify an attorney derives from the power inherent in every court "[t]o control in furtherance of justice, the conduct of its ministerial officers."'" (*City and County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal.4th 839, 846 (*Cobra Solutions*), quoting Code Civ. Proc., § 128, subd. (a)(5).) "[W]here a former client seeks to have a previous attorney disqualified from serving as counsel to a successive client in litigation adverse to the interests of the first client, the governing test requires that the client demonstrate a '*substantial relationship*' between the subjects of the antecedent and current representations. [¶] The 'substantial relationship' test mediates between two interests that are in tension in such a context—the freedom of the subsequent client to counsel of choice, on the one hand, and the interest of the former client in ensuring the permanent confidentiality of matters disclosed to the attorney in the course of the prior representation, on the other." (*Flatt v. Superior Court* (1994) 9 Cal.4th 275, 283; accord Rules Prof. Conduct, rule 1.9(a) [former client's "informed written consent" required for attorney's subsequent representation of other client with adverse interest "in the same or a substantially related matter"]; accord also *Cobra Solutions, supra*, 38 Cal.4th at p. 847 [discussing Rules Prof. Conduct, rule 3-310(E), predecessor to Rules Prof. Conduct, rule 1.9].)

"To determine whether there is a substantial relationship between successive representations, a court must first determine whether the attorney had a direct professional relationship with the former client in which the attorney personally provided legal advice and services on a legal issue that is closely related to the legal issue in the present representation. [Citation.] If the former representation involved such a direct relationship with the client, the former client need not prove the attorney actually possesses confidential information." (*Cobra Solutions, supra*, 38 Cal.4th at p. 847, citing *Jessen v. Hartford Casualty Ins. Co.* (2003) 111 Cal.App.4th 698, 709, 710-711

(*Jessen*).) Instead, "it must be presumed that confidential information has passed to the attorney and there cannot be any delving into the specifics of the communications between the attorney and the former client in an effort to show that the attorney did or did not receive confidential information during the course of that relationship." (*Jessen, supra*, at p. 709.) There are at least three sound reasons for this "conclusive presumption of knowledge of confidential information": it avoids requiring the former client to prove what is in the attorney's mind, it "also avoids the ironic result of disclosing the former client's confidences and secrets through an inquiry into the actual state of the lawyer's knowledge[,] and it makes clear the legal profession's intent to preserve the public's trust over its own self-interest." (*H. F. Ahmanson & Co. v. Salomon Brothers., Inc.* (1991) 229 Cal.App.3d 1445, 1453.)

"'[A] "substantial relationship" exists whenever the "subjects" of the prior and the current representations are linked in some rational manner.'" (*Knight v. Ferguson* (2007) 149 Cal.App.4th 1207, 1213.) The ground for discerning a sufficient link between "subject[s]" is broader than the ground arising from common facts and issues. (See *Jessen, supra*, 111 Cal.App.4th at p. 711-712.) This increased breadth protects the former client because, "[d]epending upon the nature of the attorney's relationship with the former client, in the office or in the courtroom, the attorney may acquire confidential information about the client or the client's affairs which may not be directly related to the transaction or lawsuit at hand but which the attorney comes to know in providing the representation to the former client with respect to the previous lawsuit or transaction." (*Jessen, supra*, 111 Cal.App.4th at p. 712.) "Thus, successive representations will be 'substantially related' when the evidence before the trial court supports a rational conclusion that information material to the evaluation, prosecution, settlement or accomplishment of the former representation given its factual and legal issues is also material to the evaluation, prosecution, settlement or accomplishment of the current representation given its factual and legal issues." (*Id.* at p. 713.)

8

C. *Analysis*

　　1. Substantial Evidence Supports the Trial Court's Factual Findings

　　　　"'When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. *If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion*.'" (*Jameson v. Five Feet Restaurant, Inc.* (2003) 107 Cal.App.4th 138, 143 (*Jameson*), quoting *Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.)

　　　　The record supports the court's express and implied findings that Dahle directly represented the LLC under his 2016 retainer agreement and developed an intimate knowledge of the LLC's operations based on the LLC's confidential information. The LLC's submitted declarations, by Miano and Harrod, combined with Dahle's retainer agreement, and the defendants' belated acknowledgement that Dahle had performed at least some legal work for the LLC, provide substantial evidence to support the trial court's necessary factual conclusions.

　　　　The evidence supports the conclusion either that Dahle provided many services directly to the LLC or that the LLC's operations were closely related to the corporation's operations. There was extensive overlap that included the same primary decision makers, Miano and McNary. Harrod submitted e-mails showing Dahle was also involved in operations that included management-level employees of "PlanNet" beyond Miano and McNary. Under either view, the evidence was sufficient to support a conclusion that Dahle developed an intimate knowledge of the LLC's operations based

9

on confidential information gained from Dahle's direct and personal legal representation of the LLC.

While defendants urge a different interpretation of the evidence, including their contention that Dahle subjectively believed he was representing only the corporation, substantial evidence supports the court's contrary conclusion that Dahle represented the LLC. (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 956 ["When the competent extrinsic evidence is in conflict, and thus requires resolution of credibility issues, any reasonable construction will be upheld if it is supported by substantial evidence"]; *Jameson, supra*, 107 Cal.App.4th at p. 143.)

In sum, the defendants have failed to demonstrate that the evidence was insufficient to support the trial court's factual conclusions that Dahle developed intimate knowledge about the LLC's operations based on the LLC's confidential information gained from Dahle's direct and personal legal representation of the LLC.

2. The Trial Court Did Not Abuse Its Discretion in Concluding a Substantial Relationship Exists Between the Representations

In light of the factual findings, the trial court did not abuse its discretion in concluding that Dahle's successive representation of McNary and the corporation in the underlying litigation is substantially related to Dahle's earlier legal services provided to the LLC. Information material to the evaluation, prosecution, or accomplishment of Dahle's transactional services for the LLC is also material to the evaluation, prosecution, settlement or accomplishment of Dahle's representation of the defendants against the LLC in the litigation underlying this appeal. (*Jessen, supra*, 111 Cal.App.4th at pp. 712-713.)

As noted, all of the LLC's causes of action in this case assert theories that the defendants tried to inappropriately draw away the LLC's business toward the corporation after signing the settlement agreement and licensing agreement, seeking

10

money damages. Many, if not all, of the LLC's theories of damages require analyzing what consequences, if any, resulted from defendants' alleged actions. Understanding such consequences and validating or disputing monetary calculations logically rests on issues involving the LLC's operations and what damages, if any, were proximately caused by the defendants. (See, e.g., *Skydive Arizona, Inc. v. Quattrocchi* (9th Cir. 2012) 673 F.3d 1105, 1109-1110, 1112 [discussing jury's consideration of customer evidence, plaintiff's business reputation evidence, and plaintiff's money "spent in developing and advertising its business," in awarding $2.5 million in actual damages for willful trademark infringement].) An intimate knowledge of how the LLC operates— information clearly material to Dahle previously representing the LLC in its transactional matters—would be material to assessing the LLC's alleged damages, thus demonstrating a sufficient substantial relationship link between Dahle's former and present representations. (See *Jessen, supra*, 111 Cal.App.4th at p. 711-712.)

All of the defendants' contentions against a substantial relationship existing rest on a restrictive view of the possible link between Dahle's representations. For example, the defendants argue no substantial relationship exists because "[e]ach cause of action alleged only relates to conduct [that occurred] post-settlement[, i.e., after the settlement agreement and licensing agreement were signed]." But a premise that liability-establishing facts had not occurred at the time of prior representation does not, by itself, negate a conclusion that a substantial relationship between the representations exists. (*Jessen, supra*, 111 Cal.App.4th at p. 711-712.) It is instead reasonable to conclude that Dahle's knowledge of the LLC's operations from his former representation of it relates to his representation of the defendants against the LLC here, at least as it pertains to the subject of what relief, if any, the LLC is entitled.

The defendants contend the trial court erred because the LLC only showed Dahle became aware of "classic playbook information" about the LLC, insufficient to show the necessary link of materiality between Dahle's prior and current representations.

11

The defendants rely on *Wu v. O'Gara Coach Co., LLC* (2019) 38 Cal.App.5th 1069 (*Wu*) and assert that "nothing that happened during [Dahle's] prior representation is directly at issue in, or has some critical importance to, the second representation."

*Wu* was based on an employment discrimination lawsuit brought by a former sales adviser of the defendant corporation. (*Wu, supra*, 38 Cal.App.5th at pp. 1072-1073.) On appeal, the court reversed the disqualification of the plaintiff's law firm, concluding the corporation had not shown a substantial relationship between representations because the defendant had only shown the principal of the plaintiff's law firm, who had earlier been the president and chief operating officer of the corporation, possessed only "classic playbook information" as it related to the plaintiff's case. (*Id*., at pp. 1083-1084)

In *Wu*, although the principal had already graduated from law school when employed by the corporation, it was only after ending his position there that he was admitted to the bar. (*Wu, supra*, 38 Cal.App.5th at pp. 1075, fn. 2.) The appellate court separated "what [the principal] may know simply because he participated as a nonlawyer executive in events at the company from confidential information he possesses based at least in part on attorney-client privileged communications," and focused its analysis "on the latter category." (*Id.* at p. 1083.) The *Wu* court concluded the information presented there was insufficient to demonstrate a substantial relationship between representations, reasoning that "[t]o be protected through a disqualification order, '"the information acquired during the first representation [must] be 'material' to the second; that is, it must be found to be directly at issue in, or have some critical importance to, the second representation."'" (*Ibid*, quoting *Fremont Indemnity Co. v. Fremont General Corp.* (2006) 143 Cal.App.4th 50, 69.)

*Wu* does not support the defendants' position in this case. While, as a general proposition, operational knowledge of an organization-client may only amount to insufficient playbook information (*Wu, supra*, 38 Cal.App.5th at p. 1083), in this case,

12

the subjects implicated by the facts and legal issues surrounding the LLC's claimed harm because of the defendants' conduct support a rational conclusion that intimate knowledge about the LLC's operations would be of sufficiently """critical importance""" (*ibid*), and therefore would be more than mere playbook information.

Finally, the defendants also contend we must separate information he knew as a consultant from what he knew as a lawyer in determining whether a substantial relationship exists in this case. However, the defendants do not dispute that "Dahle performed some non-litigation legal work and such work was intertwined with the business activities Dahle performed." Neither *Wu* nor the related case, *O'Gara Coach Co., LLC v. Ra* (2019) 30 Cal.App.5th 1115 (*Ra*), support defendants' argument.

*Ra* involved the same principal involved in *Wu, supra*, 38 Cal.App.5th 1069: the same former president and chief operating officer of the corporation who subsequently became a lawyer. In contrast to the intertwined legal services and nonlegal services in this case, in both *Ra* and *Wu* there was no overlap between the principal's employment as an executive and services he later provided as a lawyer. Nonetheless, because he obtained significant and relevant privileged information as an executive in acting as the point person on litigation, which was not the case in *Wu*, disqualification was required in *Ra*.

Although defendants seek to separate, for purposes of analysis, Dahle's services as a lawyer and nonlawyer, the evidence about legal services Dahle provided to the LLC supports the trial court's findings that Dahle developed intimate relevant knowledge about the LLC's operations based on the LLC's confidential information gained from his direct and personal legal representation of the LLC. The trial court did not abuse its discretion in concluding that a substantial relationship exists between Dahle's prior representation of the LLC and his current representation of the defendants against the LLC.

13

## III

### DISPOSITION

The trial court's order granting the LLC's motion to disqualify is affirmed. The LLC shall recover its costs on appeal.


ZELON, J.*

WE CONCUR:


BEDSWORTH, ACTING P. J.


GOETHALS, J.

*Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.