Filed 9/29/14  D'ull v. Kaye CA2/2

## **NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MARK D'ULL, | B252707 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC502074) |
| v. | |
| TRACY KAYE et al., | |
| Defendants and Respondents. | |

APPEAL from judgments and an order of the Superior Court of Los Angeles County.  Holly Kendig, Judge.  Reversed in part and remanded with directions.

Michael F. Frank, Peggi Gross for Plaintiff and Appellant.

Glaser Weil Fink Jacobs Howard Avchen & Shapiro, Peter C. Sheridan, James T. Grant, Brad Parr for Defendants and Respondents.

_____

Appellant contends that the trial court incorrectly sustained demurrers without leave to amend. Appellant further contends that the trial court improperly denied his motion to disqualify opposing parties' counsel. We agree, in part, and accordingly reverse, in part.

## BACKGROUND

**The Demurrers**

In March 2013, appellant Mark D'ull filed a lawsuit against respondents Tracy Kaye, M&T Property Management, LLC (M&T), Tracinda Corporation (Tracinda), and Anthony Mandekic. Tracinda and Mandekic both brought demurrers to the original complaint, which were sustained with leave to amend.[1]

D'Ull filed the operative first amended complaint (FAC) in July 2013. The FAC alleged in pertinent part: D'Ull had a profitable video business when he first met Kaye. D'Ull and Kaye considered having a relationship, and certain of Kaye's family members wished for them to do so but saw D'Ull's business (which, apparently, had some connection to pornography) as a bar to their relationship. Accordingly, Mandekic, Kaye's bookkeeper and an officer of the family company, Tracinda, induced D'Ull to shut down his business and orally agreed to pay D'Ull $2,500 per month so long as D'Ull cared for and lived with Kaye at her home and did not voluntarily leave her. While D'Ull lived with and took care of Kaye, Mandekic made the $2,500 monthly payments. Eventually, however, Kaye and/or her family decided to break off the relationship, and the family (including Mandekic) ejected D'Ull from the residence and stopped making the monthly payments.

D'Ull alleges that Mandekic breached the oral agreement by ceasing the monthly payments even though D'Ull did not voluntarily leave Kaye. D'Ull further alleges that an implied-in-fact contract was formed between himself on one side, and Kaye, Mandekic, and Tracinda on the other. The basis for this implied-in-fact contract was an

---

[1] Kaye and M&T answered the complaint.

2

understanding and course of conduct whereby D'Ull shut down his business and expended his skills, efforts, and labor in furtherance of the relationship with Kaye, which acts were compensated by monthly payments of $2,500, an arrangement that would continue until D'Ull voluntarily left Kaye. According to the FAC, the implied-in-fact contract was evidenced by the parties' behavior, including that: Kaye and D'ull made appearances at various functions as a family unit; they traveled together on business trips and vacations; Kaye assured D'Ull he would be compensated financially for the rest of Kaye's life; D'Ull assisted Kaye in maintaining real and personal property; D'Ull took care of Kaye, who required a great deal of care; D'Ull maintained relationships with and frequently hosted Kaye's friends and family; D'Ull acted as homemaker, companion, and confidant to Kaye; Kaye promised to marry D'Ull; Kaye told D'Ull on many occasions that he could live in her house without charge; and D'Ull and Kaye lived together in the house for more than seven years. D'Ull alleges that this implied-in-fact contract was breached when he was ejected from the residence and stopped receiving the monthly payments.

In total, the FAC alleges 18 causes of action, most of which involve failure to continue making monthly payments to D'Ull. The remaining causes of action primarily concern D'Ull's and Kaye's rights and responsibilities with respect to M&T, a business of which they are both 50 percent owners. According to the FAC, M&T owns an apartment building in Long Beach. Tracinda loaned M&T the money to purchase the building.

Both Mandekic and Tracinda brought demurrers to the FAC. The trial court sustained the demurrers in their entirety without leave to amend, and judgments were subsequently entered in favor of Mandekic and Tracinda. D'Ull timely appealed.

**The Motion to Disqualify**

Throughout the litigation, including on appeal, all four defendants (Kaye, M&T, Mandekic, and Tracinda) have been represented by the law firm of Glaser Weil Fink Jacobs Howard Avchen & Shapiro LLP (Glaser Weil). In addition to appearing as defendants, in March 2013 Kaye and M&T filed a cross-complaint against D'Ull and

3

M&T (as a nominal cross-defendant) for, among other things, conversion and embezzlement, and dissolution and winding-up of M&T. It appears from the record that the cross-complaint is still pending.

In July 2013, D'Ull filed a motion to disqualify Glaser Weil as attorneys of record for defendants. D'Ull contended that he was a client of Glaser Weil as the firm represented him in the formation of M&T, and that Glaser Weil's adverse representation in this case created a conflict. He further argued that, even if he was not a client, Glaser Weil possessed confidential information pertaining to him, which necessitated its disqualification. Moreover, D'Ull asserted that as a 50 percent owner of M&T, he had a right to choose M&T's counsel, but Kaye unilaterally designated Glaser Weil to represent M&T. Glaser Weil opposed the motion by presenting evidence tending to show that D'Ull was not a former client and that the firm did not possess any confidential information that would require disqualification.

The trial court denied the motion to disqualify. It found that Glaser Weil had never represented D'Ull and that D'Ull had never provided confidential information to the firm. Thus, the court found that D'Ull lacked standing to seek to disqualify the firm. D'Ull timely appealed this order as well.

## DISCUSSION

### I. Demurrers

#### A. Standard of Review

We review the ruling sustaining the demurrers de novo, exercising independent judgment as to whether the complaint states a cause of action as a matter of law. (*Desai v. Farmers Ins. Exchange* (1996) 47 Cal.App.4th 1110, 1115.) We give the complaint a reasonable interpretation, assuming that all properly pleaded material facts are true, but not assuming the truth of contentions, deductions, or conclusions of law. (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967.)

A demurrer tests the legal sufficiency of the complaint. (*Hernandez v. City of Pomona* (1996) 49 Cal.App.4th 1492, 1497.) Accordingly, we are not concerned with the difficulties plaintiff may have in proving the claims made in the complaint. (*Desai v.*

*Farmers Ins. Exchange*, *supra*, 47 Cal.App.4th at p. 1115.) We are also unconcerned with the trial court's reasons for sustaining the demurrer, as it is the ruling, not the rationale, that is reviewable. (*Mendoza v. Town of Ross* (2005) 128 Cal.App.4th 625, 631; *Sackett v. Wyatt* (1973) 32 Cal.App.3d 592, 598, fn. 2.)

## B. Causes of Action

Between the original complaint and the FAC, D'Ull pled 14 causes of action against Mandekic and/or Tracinda. On appeal, he does not challenge the rulings disposing of four of these claims.[2] We therefore review the remaining 10 causes of action.

### 1. Breach of oral agreement

The elements of a breach of contract cause of action are: (1) the existence of a contract, (2) plaintiff's performance or excuse for nonperformance, (3) breach by the defendant, and (4) resulting damage. (*Harris v. Rudin, Richman & Appel* (1999) 74 Cal.App.4th 299, 307.) In his first cause of action, D'Ull alleges that Mandekic promised that he would buy out D'Ull from his business by making a monthly payment of $2,500 to D'Ull so long as he remained with Kaye and did not leave her voluntarily. D'Ull shut down his business and moved in with and cared for Kaye. He alleges that Mandekic breached their oral agreement by assisting Kaye and her family in breaking off the relationship with D'Ull, and by discontinuing payments even though D'Ull had not voluntarily left Kaye.

Mandekic contends that the demurrer was properly sustained on several different bases. First, he argues that there was no breach. According to Mandekic, D'Ull's original complaint discloses that the contract was actually performed because D'Ull accepted the buyout offer and was paid $2,500 per month. The original complaint alleges, however, that the payments were to continue "as long as plaintiff did not leave Kaye and lived with Kaye at the home." Construing the pleadings liberally, as we must

---

[2] These four causes of action were titled: injunctive relief, declaratory relief, cancellation/rescission of instrument, and equitable estoppel.

(Code Civ. Proc., § 452), we determine that D'Ull adequately alleges a breach. D'Ull's clarification in the FAC that the payments would continue until he "voluntarily" left Kaye did not materially change the meaning of the original allegation. Under both the original complaint and the FAC, D'Ull alleges that he did not leave Kaye (rather, Kaye and/or her family caused the breakup), and that Mandekic breached the oral agreement by stopping payments.

Mandekic also asserts that the breach of oral agreement claim is barred by the statute of frauds because the payment obligation could continue indefinitely, depending on when D'Ull chose (or chose not) to end the relationship with Kaye. Civil Code section 1624, subdivision (a)(1) provides that, in the absence of a note or memorandum thereof, an agreement is invalid if, by its terms, it is not to be performed within one year. This provision, though, is interpreted "literally and narrowly." (*Plumlee v. Poag* (1984) 150 Cal.App.3d 541, 548.) "Only those contracts which expressly preclude performance within one year are unenforceable." (*Ibid.*) "If performance under a contract could be terminated within one year under some contingency it makes no difference whether the contract has a definite outside term of two years, three years or five years—or whether it is for the [plaintiff's] lifetime or some other 'indefinite' period." (*Abeyta v. Superior Court* (1993) 17 Cal.App.4th 1037, 1044.) Nothing in the oral agreement as alleged by D'Ull prevented him from terminating the agreement within a year of formation. The alleged agreement, therefore, is not subject to the statute of frauds.

Mandekic further contends that the principles outlined in *Marvin v. Marvin* (1981) 122 Cal.App.3d 871 (*Marvin II*) prevent D'Ull from basing a contract action upon his relationship with Kaye. *Marvin II* followed *Marvin v. Marvin* (1976) 18 Cal.3d 660 (*Marvin I*), in which our Supreme Court held that "courts should enforce express contracts between nonmarital partners except to the extent that the contract is explicitly founded on the consideration of meretricious sexual services." (*Id.* at p. 665.) D'Ull alleges the consideration he provided in connection with the oral agreement was the termination of his business, as well as living with and caring for Kaye. He does not claim

6

to be owed money for providing sexual services. Thus, neither *Marvin I* nor *Marvin II* bars the cause of action.

Accordingly, the demurrer was incorrectly sustained as to the first cause of action.

### 2. Breach of implied-in-fact contract

A breach of implied contract cause of action has the same elements as a breach of contract cause of action, except that the promise is implied from conduct, not expressed in words. (*Yari v. Producers Guild of America, Inc.* (2008) 161 Cal.App.4th 172, 182.) The cause of action as pled in the FAC relies on similar allegations as the first cause of action. In pertinent part it alleges—based on D'Ull's termination of his business and his conduct in living with and caring for Kaye—that Mandekic and Tracinda, by agreement and through their conduct, had an obligation to continue paying D'Ull $2,500 a month until he voluntarily left Kaye, and that they breached this agreement.

Respondents' bases for attacking the second cause of action are the same as those asserted in addressing the first cause of action. For the reasons stated above, these arguments fail.[3, 4]

### 3. Tortious breach of contract

A plaintiff may recover tort damages in connection with a breach of contract under limited circumstances. "Contract and tort are different branches of law. Contract law exists to enforce legally binding agreements between parties; tort law is designed to vindicate social policy." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 514; see also *Stop Loss Ins. Brokers, Inc. v. Brown & Toland Medical Group*

---

[3]    *Marvin I* explicitly held that an implied contract claim may arise from conduct between parties in a nonmarital relationship. (*Marvin I*, *supra*, 18 Cal.3d at p. 665.)

[4]    Respondents assert that part of the alleged consideration for the $2,500 monthly payments was D'Ull's efforts in working for the M&T business. According to respondents, D'Ull was already obligated to perform such work and cannot recover under a breach of implied contract claim. This argument is not well taken, as a demurrer may only dispose of an entire cause of action, not individual allegations. (*Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 119.)

(2006) 143 Cal.App.4th 1036, 1057-1058.) Tortious breach of contract is generally confined to the insurance context, but may be found outside it "'when (1) the breach is accompanied by a traditional common law tort, such as fraud or conversion; (2) the means used to breach the contract are tortious, involving deceit or undue coercion or; (3) one party intentionally breaches the contract intending or knowing that such a breach will cause severe, unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential damages.'" (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 553-554.)

D'Ull's allegations fail to meet the first two of these exceptions to the general rule. D'Ull recites that defendants' breach of contract was accompanied by fraud, but the allegations contain no explanation of what that fraud was. (See *Aubry v. Tri-City Hospital Dist.*, *supra*, 2 Cal.4th 962, 967 [court does not assume truth of conclusions of law].) Furthermore, D'Ull does not allege that the means used to breach the contract involved deceit or undue conversion. However, construing the allegations liberally, we find that D'Ull has adequately alleged a tortious breach of contract based on the allegation that defendants intentionally breached the agreement knowing that the breach would cause severe, unmitigable harm. According to the FAC, in breaching, defendants knew that D'Ull "would essentially be on the street, without an income," and with his belongings stuffed into a storage "pod" by respondents, events that could cause mental anguish and personal hardship.

### 4. Tortious denial of contract

The demurrers by Mandekic and Tracinda to the tortious denial of contract cause of action were properly sustained. In *Freeman & Mills, Inc. v. Belcher Oil Co.* (1995) 11 Cal.4th 85, 102, our Supreme Court established a general rule precluding recovery under such a claim except for in an insurance-related action. D'Ull offers no valid reason for why this general rule should not apply in this case. D'Ull argues that he pled a special relationship giving rise to a tort-based duty, but at most his allegations plead a fiduciary duty between himself and Kaye, not with Tracinda or Mandekic.

8

### 5. Fraud and deceit

D'Ull's allegations of fraud largely mirror those underlying his breach of contract causes of action. D'Ull alleges that Mandekic promised that he would make the monthly payments if D'Ull shut down his business and lived with and cared for Kaye. Defendants terminated the relationship and ceased making payments to D'Ull. The only additional, substantive allegation made in connection with the fraud cause of action is that, in 2011 pay stubs for checks written to D'Ull for the monthly payments were labeled "gift," when they previously had been labeled "agreement" or "advance to owner."

These additional allegations are not sufficient to turn a breach of contract cause of action into one for fraud. Fraud must be pled with specificity; general and conclusory allegations do not meet this standard. (*Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 184.) This requirement of pleading with specificity "'"'necessitates pleading *facts* which "show how, when, where, to whom, and by what means the representations were tendered."'"'" ( *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645.)

The FAC's allegations are almost entirely devoid of specificity, even though D'Ull was given the opportunity to amend his complaint. D'Ull complains that defendants possess full information concerning the facts of fraud and deceit, which creates an exception freeing him from the obligation to plead with particularity. (See *Rossberg v. Bank of America, N.A.* (2013) 219 Cal.App.4th 1481, 1500.) The problem with D'Ull's argument is that he generally alleges a number of purportedly fraudulent representations made directly to him. These allegations, however, do not contain any specificity as to how, when, where, and by what means the representations were made. Since D'Ull was the alleged recipient of these representations, he should have sufficient knowledge to plead with some level of particularity. His failure to do so renders the claim nonactionable.

### 6. Promissory fraud

D'Ull's promissory fraud cause of action is pled even more vaguely than the preceding claim for fraud and deceit. Because its allegations lacks the required specificity, the promissory fraud claim also fails. (See *Beckwith v. Dahl* (2012) 205

9

Cal.App.4th 1039, 1060 [each element of promissory fraud must be pled with particularity].)

### 7. Quantum meruit

D'Ull's quantum meruit claim differs from his claims for breach of contract. D'Ull alleges that he rendered extensive labor and services (including maintenance, repairs, collection of rents, refurbishment, answering tenant calls, evicting tenants, renting units, bookkeeping, and management) for the apartment building owned by M&T, at the request of defendants, without compensation. According to the FAC, defendants promised to pay D'Ull for this work.

"Quantum meruit refers to the well-established principle that 'the law implies a promise to pay for services performed under circumstances disclosing that they were not gratuitously rendered.' [Citation.] To recover in quantum meruit, a party need not prove the existence of a contract [citations], but it must show the circumstances were such that 'the services were rendered under some understanding or expectation of both parties that compensation therefor was to be made' [citations]." (*Huskinson & Brown v. Wolf* (2004) 32 Cal.4th 453, 458.) A claim for quantum meruit lies when a contract for services is not fixed as to the amount of compensation; the trier of fact determines the reasonable value of services. (*Meredith v. Marks* (1963) 212 Cal.App.2d 265, 272-273.)

Defendants argue that D'Ull's quantum meruit claim fails because the complaint alleges the terms of the compensation D'Ull was to be paid and alleges that he agreed to those terms. Defendants are mistaken. Under D'Ull's quantum meruit claim, he seeks payment for services rendered in connection with the apartment building—not for the termination of his business and caring for Kaye, the alleged bases for the monthly $2,500 payments.[5] The FAC alleges that D'Ull was to be paid for services rendered for the

---

[5] Defendants contend that amendments made by D'Ull in the FAC violated the sham pleading doctrine as expressed in *Tostevin v. Douglas* (1958) 160 Cal.App.2d 321, 327. The amendments, however, merely clarified that D'Ull's quantum meruit claim was entirely separate from his breach of contract claims. In the original complaint, D'Ull did

10

apartment building, but it does not indicate a certain amount of agreed-upon compensation. The quantum meruit claim, therefore, is properly pled.

### 8. Intentional infliction of emotional distress

The elements of intentional infliction of emotional distress are: "'"'(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. . . .'"'" (*Christensen v. Superior Court* (1991) 54 Cal.3d 868, 903.) To be considered outrageous, conduct must exceed all bounds of what is generally tolerated in a civilized community. (*Ibid.*)

D'Ull does not allege any outrageous conduct. The allegations underlying the intentional infliction of emotional distress claim primarily involve disputes over the apartment building and M&T—e.g., leaving the building exposed to foreclosure, refusing to list the building for sale, shutting down the M&T bank account, and refusing to have Tracinda abate foreclosure proceedings. These business disputes do not exceed the bounds of expected behavior in our society.

D'Ull vaguely alleges that defendants directed "verbal abuse" at him and "promulgat[ed] derogatory statements" about him. Without any further detail as to the scope and content of such acts, we cannot say that they constitute conduct that exceeds all bounds of what is tolerated in a civilized community. (See *Cochran v. Cochran* (1998) 65 Cal.App.4th 488, 498 ["In short, the parties to an intimate relationship gone bad were now feuding. Those feuds are often accompanied by an exchange of hostile unpleasantries which are intended to sting whoever sits at the delivery end. While the pain inflicted might be real, the tort of intentional infliction of emotional distress was never intended to remove all such barbs."].) Therefore, because D'Ull does not allege

---

not allege that the $2,500 monthly checks were full payment for work done related to the apartment building.

outrageous conduct, his intentional infliction of emotional distress claim fails.

### 9. Conspiracy of fraud

The demurrers were properly sustained as to this purported cause of action. "Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, *supra*, 7 Cal. 4th 503, 510-511.) D'Ull cannot seek to recover damages on the sole basis that there was an alleged conspiracy. An actionable conspiracy does not exist in the absence of an actual tort. (*Id.* at p. 511.) It appears that D'Ull attempts to base his claim of conspiracy on defendants' alleged fraud. However, because the fraud claims fail due to lack of specificity, D'Ull is unable to state a basis for conspiratorial liability.

### 10. Promissory estoppel

Finally, D'Ull has adequately alleged a cause of action for promissory estoppel. "The elements of a promissory estoppel claim are '(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance.'" (*US Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887, 901.) The FAC states that defendants promised D'Ull that if he shut down his business and lived with Kaye, he would receive monthly payments of $2,500 until the time he voluntarily left Kaye. D'ull relied on the promise and accordingly terminated his business, but he was injured when he stopped receiving monthly payments even though he did not voluntarily leave Kaye.

Defendants argue that D'Ull's allegations disclose that the alleged promise was fully performed. This assertion is incorrect, as D'Ull alleges that the monthly payments ceased even though he had not left Kaye.

## II. **Motion to disqualify**

We next turn to the denial of D'Ull's motion to disqualify Glaser Weil as attorneys of record for defendants. An order granting or denying a motion to disqualify counsel is

12

appealable. (*Truck Ins. Exchange v. Fireman's Fund Ins. Co.* (1992) 6 Cal.App.4th 1050, 1052, fn. 1; *Orange County Water Dist. v. The Arnold Engineering Co.* (2011) 196 Cal.App.4th 1110, 1116, fn. 2.)

## A. The trial court's findings

The trial court found that Glaser Weil had never represented D'Ull and that D'Ull had never provided confidential information to the firm. On that basis, the court found that D'Ull lacked standing to seek to disqualify the firm, and denied D'Ull's motion.

"'Generally, a trial court's decision on a disqualification motion is reviewed for abuse of discretion. [Citations.] If the trial court resolved disputed factual issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence. [ Citations.] When substantial evidence supports the trial court's factual findings, the appellate court reviews the conclusions based on those findings for abuse of discretion. [Citation.] However, the trial court's discretion is limited by the applicable legal principles. [Citation.] Thus, where there are no material disputed factual issues, the appellate court reviews the trial court's determination as a question of law. [Citation.]'" (*City and County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal.4th 839, 848.)

In evaluating whether a conflict exists that requires an attorney's disqualification, the court first looks to whether representation is concurrent or successive. (*Gong v. RFG Oil, Inc.* (2008) 166 Cal.App.4th 209, 214 (*Gong*).) Rule 3-310(C) of the California Rules of Professional Conduct prohibits concurrent representation of clients in matters presenting actual or potential conflicts without the informed written consent of each client.[6] The primary concern when an attorney simultaneously represents potentially

---

**6**     Rule 3-310(C) states, in full: "(C) A member shall not, without the informed written consent of each client: [¶] (1) Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or [¶] (2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict; or [¶] (3) Represent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter."

adverse parties is the attorney's duty of loyalty. (*Flatt v. Superior Court* (1994) 9 Cal.4th 275, 284.) "Where the duty of loyalty applies, it requires a *per se*, or automatic disqualification, in all but a few instances." (*Metro-Goldwyn-Mayer, Inc. v. Tracinda Corp.* (1995) 36 Cal.App.4th 1832, 1840.) In contrast, when an attorney represents a client following representation of a former client, the foremost consideration is the duty of confidentiality owed to the prior client. "Thus, where a former client seeks to have a previous attorney disqualified from serving as counsel to a successive client in litigation adverse to the interests of the first client, the governing test requires that the client demonstrate a '*substantial relationship*' between the subjects of the antecedent and current representations." (*Flatt*, at p. 283.)

D'Ull did not claim to be a current client of Glaser Weil's. D'Ull did assert, however, that he was a former client of Glaser Weil's, and that the firm's former representation was substantially related to the instant lawsuit. As the party seeking to disqualify Glaser Weil, D'Ull had the burden of proving that he was a client of the firm. (*Koo v. Rubio's Restaurants, Inc.* (2003) 109 Cal.App.4th 719, 729 (*Koo*).)

The existence of an attorney-client relationship is generally a question of law, but when the evidence is conflicting, it involves a question of fact. (*Responsible Citizens v. Superior Court* (1993) 16 Cal.App.4th 1717, 1733.) In moving to disqualify Glaser Weil, D'Ull submitted a declaration stating that the firm had represented him in the formation of M&T, the drafting of the M&T operating agreement, and "many legal issues" relating to a loan from Tracinda to M&T in connection with M&T's purchase of the apartment building. In opposition, Glaser Weil submitted attorney declarations stating that D'Ull never had an attorney-client relationship with the firm. One attorney declaration stated that Glaser Weil did not represent D'Ull in the formation of M&T or any other matter, that the firm never issued a bill to D'Ull as a client, that the firm never opened a client file for D'Ull, and that no documents in the firm's records indicated that D'Ull was treated as or perceived as a client. Another declaration stated that D'Ull was told, in connection with the formation of M&T, that Glaser Weil did not represent him, and he was advised to retain his own counsel. In addition, Glaser Weil submitted a copy of the

14

M&T operating agreement, which explicitly stated that the firm did not represent any individual member (including D'Ull) with respect to the agreement. Given the weight of this evidence, the trial court was correct in finding that D'Ull was never a client of Glaser Weil's. (See *Koo*, *supra*,109 Cal.App.4th 719, 729 [a unilateral declaration alone does not create an attorney-client relationship].)

Even in the absence of an attorney-client relationship, however, disqualification may be appropriate where "'there exists *a genuine likelihood that the status or misconduct of the attorney in question will affect the outcome of the proceedings before the court*. Thus, disqualification is proper where, as a result of a prior representation or through improper means, there is a reasonable probability counsel has obtained information the court believes would likely *be used advantageously against an adverse party during the course of the litigation.*'" (*Oaks Management Corporation v. Superior Court* (2006) 145 Cal.App.4th 453, 467; *Kennedy v. Eldridge* (2011) 201 Cal.App.4th 1197, 1205.) D'Ull, though, did not establish that Glaser Weil had obtained such information about him. His declaration simply asserted that Glaser Weil was "intimately familiar" with him and his "situation, background" and "confidential information." Meanwhile, Glaser Weil submitted declarations stating that D'Ull had never exchanged confidential information with the firm. The few exchanges that did occur between the firm and D'Ull merely asked for his review and signature on documents relating to the formation of M&T. Accordingly, the trial court did not err in finding that Glaser Weil was not in possession of confidential or improperly obtained information that could be used advantageously against D'Ull.

### B.  Glaser Weil's representation of M&T

In addition to arguing that he was a former client of Glaser Weil's and that the firm possessed his confidential information, D'Ull asserted that a conflict existed by virtue of Glaser Weil's representation of both Kaye and M&T, since D'Ull and Kaye are each 50 percent members of M&T. The trial court never addressed this argument.

*Gong*, *supra*,166 Cal.App.4th 209, addressed issues similar to those in the instant matter. In *Gong*, a law firm represented a closely held corporation and its 51 percent

15

shareholder. The 49 percent shareholder asserted that a conflict of interest existed between the corporation and the majority shareholder. The Court of Appeal agreed, noting that a "corporation's legal advisor must abstain from taking part in controversies among the corporation's directors and shareholders 'to avoid placing . . . the practitioner in a position where he may be required to choose between conflicting duties or attempt to reconcile conflicting interests.'" (*Id.* at p. 214.) Generally, an attorney representing a corporation "may also represent any of its directors, officers, employees, members, shareholders, or other constituents, subject to the provisions of rule 3-310." (Rules of Prof. Conduct, rule 3-600(E).) However, dual representation was not appropriate in *Gong* because the interests of the corporation and the majority shareholder were not completely aligned. (*Gong*, *supra*, 166 Cal.App.4th at p. 215.) The minority shareholder sought involuntary dissolution and specific performance of a buy-sell agreement with the majority shareholder, and also sought damages from the corporation for wrongful termination and from the majority shareholder for breaches of fiduciary duty. In addition, the corporation filed a cross-complaint against the minority shareholder for fraud and breaches of fiduciary duty, and to cancel the minority shareholder's shares. The court found that these circumstances created an actual conflict between the majority shareholder and the corporation, preventing the attorney from satisfying his undivided duties of loyalty to each. (*Id.* at pp. 215-216.)

The *Gong* court reasoned that the most functional solution was to order that the corporation obtain separate counsel, allowing the majority shareholder's lawyer to continue representing him individually, as any personal loyalties held by the lawyer would be to the individual client. (*Gong*, *supra*,166 Cal.App.4th 209, 216-217.) The court found that requiring the corporation to retain new counsel, without previous connections to it or the shareholders, "preserves the duty of loyalty and the public trust in the administration of justice." (*Id.* at 217.)

*Gong* is directly applicable here.**7**  Like the plaintiff in *Gong*, D'Ull seeks both dissolution of and damages from the corporation (M&T).  In addition, D'Ull alleges that Kaye converted funds from M&T and breached her fiduciary duties to M&T and to him as a 50 percent member.  Meanwhile, the cross-complaint brought by Kaye and M&T against D'Ull and M&T alleges that D'Ull converted M&T's funds and breached his fiduciary duties to Kaye and M&T.  The cross-complaint also seeks dissolution and winding up of M&T.  Under these circumstances, it is clear that neither D'Ull's nor Kaye's interests are directly aligned with those of M&T.**8**

---

**7**  *Havasu Lakeshore Investments, LLC v. Fleming* (2013) 217 Cal.App.4th 770, a case relied on by respondents in arguing against disqualification, is distinguishable.  A law firm simultaneously represented a limited liability company, its managing member, and the person who managed the managing member in a lawsuit against two of the company's nonmanaging minority members.  (*Id.* at pp. 773, 781-782.)  In contrast to the defendants in *Havasu*, D'Ull is a managing 50 percent member of M&T.  Moreover, the *Havasu* lawsuit did not involve an attempt to force dissolution of the company, or allegations of misuse of funds by a managing member.  (*Id.* at p. 781.)  Those issues are present here, as they were in *Gong*.

**8**  The waiver provision contained in the M&T operating agreement, which states "each of the Members [of M&T] hereby forever knowingly waives as to [Glaser Weil] each and every conflict of any kind whatsoever in connection with the foregoing," does not prevent D'Ull from seeking disqualification as to M&T.  Factors considered in determining the effect of an advance waiver include the breadth of the waiver, the time period embraced by the waiver, the quality of the lawyer's conflict discussion with the client, the waiver's specificity, the nature of the actual conflict, the client's sophistication, and the interests of justice.  (*Visa U.S.A., Inc. v. First Data Corp.* (N.D.Cal. 2003) 241 F.Supp.2d 1100, 1106, citing *People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1145, *Zador Corp. v. Kwan* (1995) 31 Cal.App.4th 1285; see also *Concat LP v. Unilever, PLC* (N.D.Cal. 2004) 350 F.Supp.2d 796, 820.)  On balance, these factors do not weigh in favor of applying the waiver here.  By its terms, the waiver provision only applies to "the foregoing," which appears to refer to the paragraph where the wavier provision is found, pertaining to Glaser Weil's preparation of the M&T operating agreement; the claims in this case do not revolve around the firm's preparation of the agreement.  Moreover, the language of the provision does not does not provide any basis to find that D'Ull consented to Glaser Weil's joint representation of Kaye and M&T, particularly in a case where D'Ull is the adverse party.

17

As in *Gong*, we determine that the most appropriate course of action is to find Glaser Weil disqualified from representing M&T, while allowing it to continue in its representation of Kaye, Tracinda, and Mandekic. D'Ull has identified no disqualifying conflicts that would arise from Glaser Weil's continued representation of these three clients. Disqualification of an attorney often imposes a substantial hardship on the attorney's client (*Koo*, *supra*, 109 Cal.App.4th 719, 734), and we see no reason to force these parties to endure this hardship here. The conflict of interest identified by D'Ull should be eliminated by requiring M&T to retain new counsel unaffiliated with M&T, Kaye, D'Ull, or the other parties.[9]

### DISPOSITION

The judgments in favor of Mandekic and Tracinda are reversed and remanded with directions to the trial court to vacate its order sustaining demurrers to only the following causes of action: breach of oral agreement against Mandekic; breach of implied-in-fact contract against Tracinda and Mandekic; tortious breach of contract against Tracinda and Mandekic; quantum meruit against Tracinda and Mandekic; and promissory estoppel against Tracinda and Mandekic.

The order denying the motion to disqualify Glaser Weil is reversed in part as it pertains to M&T, and the remainder is affirmed. The matter is remanded with directions to the trial court to an enter an order disqualifying Glaser Weil as attorney of record for M&T and (after further briefing and/or hearing, as required) to enter an order stating the

---

[9] Respondents argue that D'Ull unreasonably delayed in bringing his motion to disqualify counsel, an argument not reached by the trial court. Delay is a basis to deny a motion for disqualification when the motion was brought as a tactical device to delay litigation, but in such instances the delay must be extreme. (*Gong*, *supra*, 166 Cal.App.4th 209, 217; *Western Continental Operating Co. v. Natural Gas Corp.* (1989) 212 Cal.App.3d 752, 764-765.) It does not appear that D'Ull's motion was simply a tactical device meant to delay litigation. Moreover, D'Ull filed the motion approximately four months after commencing the litigation, before the demurrers to his original complaint were sustained. This hardly constitutes an extreme delay.

18

identity of M&T's new counsel.  The new counsel to be appointed shall have no prior affiliation with any party.

D'Ull is awarded costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


BOREN, P.J.

We concur:


CHAVEZ, J.


HOFFSTADT, J.