[No. B175204. Second Dist., Div. Six. Sept. 7, 2004.]

CITY OF SANTA BARBARA, Petitioner, v.
THE SUPERIOR COURT OF SANTA BARBARA COUNTY, Respondent;
ROBERT STENSON et al., Real Parties in Interest.

## Counsel

Stephen P. Wiley, City Attorney, and Janet K. McGinnis, Assistant City Attorney, for Petitioner.

No appearance for Respondent.

Hatch & Parent, Diane M. Matsinger and Eric Berg for Real Parties in Interest.

## Opinion

**YEGAN, J.—** ■ An attorney who switches sides during litigation is disqualified from representing his or her former adversary. The disqualification extends to the attorney's entire new law firm. But a city attorney's office is not a "law firm" within the meaning of the vicarious disqualification rule. As we shall explain, in an ordinary civil case, disqualification of a nonsupervisorial deputy city attorney should not result in the vicarious disqualification of the entire city attorney's office. Such would deprive the city of its counsel of choice, result in an unnecessary burden on the public fisc, and provide an unnecessary litigation disadvantage to the city.

To be sure, the appearance of justice is important and the courts should, when necessary, do everything in their power to protect the confidentiality of attorney client communications. However, in the presenting circumstances, the creation and maintenance of an "ethical wall" or "ethical screen" is sufficient to protect the confidentiality of attorney client communications, as well as the integrity of the judicial process.

## Facts

On June 1, 2003, water and sewage from a City of Santa Barbara (City) main flooded portions of the Stensons' house on Edgewater Way in Santa Barbara. The City contends this incident occurred because the Stensons did not equip their sewer lateral with a working backflow device. The Stensons contend they are not required to install a backflow device and that the incident occurred because the City failed properly to maintain and repair the sewer line.

The Stensons retained Hatch & Parent to represent them in litigation against the City for damages caused by the incident. Two Hatch & Parent lawyers, Eric Berg and Sarah Knecht, worked on the matter. Between early December 2003 and February 2004, Ms. Knecht performed over 30 hours of legal services for the Stensons, representing about 40 percent of the total time billed by Hatch & Parent. Among other things, she met with Dr. Stenson to discuss the factual and legal basis for the lawsuit and to develop a strategy for pursuing the claim against the City. Knecht reviewed documents, videotapes and photographs submitted by Dr. Stenson and inspected the property. She also conducted legal research and drafted discovery requests.

In early February 2004, Knecht informed Hatch & Parent that she had accepted a job at the city attorney's office. Her first day of work for the City was March 8, 2004. In the interim, the Stensons informed both the city attorney and Janet McGinnis, the assistant city attorney responsible for this litigation, that they would move to disqualify the office based on Ms. Knecht's conflict of interest.

McGinnis constructed an "ethical wall" to prevent Knecht's access to any information, documents or other materials related to the Stenson litigation. McGinnis does not supervise Knecht and her staff does not work for or with Knecht. Everyone in the office has been instructed "to prevent [Knecht] from being involved in communications about this case or having access to any records or documents related to this case." Litigation files are segregated from files on nonlitigation matters and are stored in or near McGinnis's office. Knecht does not work on litigation matters and "has had no reason to access any cabinet with litigation files." McGinnis does not attend office staff meetings or report on litigation to any member of the office other than the city attorney, Stephen Wiley.

## Trial Court Ruling

The trial court concluded an ethical wall was not sufficient and that disqualification of the entire city attorney's office was required by the vicarious disqualification rule. In its writ petition, the City contends the order

should be vacated because its ethical wall will protect the Stensons' confidences. The Stensons concede that Knecht has not disclosed their confidential communications but they do not waive the conflict. They maintain they should not be required to trust that their adversary in litigation will refrain from using confidential information against them.

### First Impression Case

As the Stensons point out, no California court has sanctioned the use of an ethical wall under the circumstances present here: an attorney with direct, personal knowledge of client confidences goes to work for the clients' adversary while the litigation is pending, moving from a private law firm to the public law office representing the adversary, which office has established an ethical wall to prevent the disclosure of confidential information. Cases that have accepted ethical screening for public lawyers have involved lawyers who did not personally work on the matter in which the conflict is raised (*Chambers v. Superior Court* (1981) 121 Cal.App.3d 893 [175 Cal.Rptr. 575]), lawyers involved in criminal prosecutions (*Chadwick v. Superior Court* (1980) 106 Cal.App.3d 108 [164 Cal.Rptr. 864]), or lawyers who were physically and functionally separated from their adversaries. (*People v. Christian* (1996) 41 Cal.App.4th 986 [48 Cal.Rptr.2d 867]; *Castro v. Los Angeles County Bd. of Supervisors* (1991) 232 Cal.App.3d 1432 [284 Cal.Rptr. 154].) Cases rejecting ethical walls have involved public lawyers who personally represented the conflict-creating client and who also have managerial, supervisory and policymaking responsibilities in the public law office. (See, e.g., *People v. Lepe* (1985) 164 Cal.App.3d 685 [211 Cal.Rptr. 432]; *Younger v. Superior Court* (1978) 77 Cal.App.3d 892 [144 Cal.Rptr. 34].)

■ An appellate court reviews routine attorney disqualification orders for abuse of discretion. (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems Inc.* (1999) 20 Cal.4th 1135, 1143 [86 Cal.Rptr.2d 816, 980 P.2d 371] (hereafter, *SpeeDee Oil Change*).) But this is not a routine case. Indeed, the trial court did not even purport to exercise discretion; ruling instead that vicarious disqualification was mandatory. When the trial court issued its order and when we issued our order to show cause, no published California case had considered vicarious attorney disqualification in the context of an entire city attorney's office. We decide the question of law on a de novo basis.

### Attorney Disqualification

■ "A trial court's authority to disqualify an attorney derives from the power inherent in every court '[t]o control in furtherance of justice, the

conduct of its ministerial officers, and of all other persons in any manner connected with the judicial proceeding before it, in every matter pertaining thereto.' (Code Civ. Proc., § 128, subd. (a)(5) . . . .)" (*SpeeDee Oil Change, supra,* 20 Cal.4th at p. 1145.) Motions to disqualify counsel are especially prone to tactical abuse because disqualification imposes heavy burdens on both the clients and courts: clients are deprived of their chosen counsel, litigation costs inevitably increase and delays inevitably occur.[1] As a result, these motions must be examined "carefully to ensure that literalism does not deny the parties substantial justice." (*Id.* at p. 1144.) At the same time, we recognize that disqualification of counsel is necessary under certain circumstances, to protect the integrity of our judicial process by enforcing counsel's duties of confidentiality and loyalty. (*Id.* at pp. 1145–1146; see also *Flatt v. Superior Court* (1994) 9 Cal.4th 275, 283–284 [36 Cal.Rptr.2d 537, 885 P.2d 950].)

■ An attorney's ethical duties to maintain undivided loyalty to his or her clients and to preserve the confidentiality of client communications require that the attorney refrain from simultaneous or successive representation of clients with adverse interests. (Rules Prof. Conduct, rule 3-310.)[2] At a minimum, standards of professional responsibility mandate that an attorney not switch sides during pending litigation, moving from the representation of one party in a lawsuit to the representation of that party's adversary in the same matter. Switching sides "suggests to the clients—and to the public at large—that the attorney is completely indifferent to the duty of loyalty and the duty to preserve confidences. However, the attorney's actual intention and motives are immaterial, and the rule of automatic disqualification applies." (*SpeeDee Oil Change, supra,* 20 Cal.4th at p. 1147.)

■ The individual attorney's disqualification extends to his or her entire law firm. (*SpeeDee Oil Change, supra,* 20 Cal.4th at p. 1146.) "When attorneys presumptively share access to privileged and confidential matters because they practice together in a firm, the disqualification of one attorney extends vicariously to the entire firm. [Citation.] The vicarious disqualification rule recognizes the everyday reality that attorneys, working together and practicing law in a professional association, share each other's, and their

---

[1] Here, there is an additional consideration. The city attorney's office has a special area of expertise not generally shared by the litigation bar, i.e. the representation and defense of lawsuits relating to sewer construction and maintenance.

[2] Rule 3-310 (E) of our State Bar Rules of Professional Conduct provides: "A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment." In this context, the term "member," means a member of the State Bar of California. (Rules Prof. Conduct, rule 1-100 (B)(2).)

clients', confidential information." (*Id.* at pp. 1153–1154.) Vicarious disqualification not only preserves the confidentiality of client information, it preserves public confidence in the legal profession and the judicial process by enforcing the attorney's duty of undivided loyalty. (*Id.* at p. 1146; see also *Flatt v. Superior Court, supra,* 9 Cal.4th at p. 285; *Cho v. Superior Court* (1995) 39 Cal.App.4th 113, 125 [45 Cal.Rptr.2d 863].)

Here, Knecht switched sides while this lawsuit was pending. She moved from the law firm that represented the Stensons in their lawsuit against the City, to the city attorney's office. The parties all agree that, as a result, she would be disqualified from representing the City in this matter. The apt questions are whether Knecht's disqualification requires the vicarious disqualification of the entire city attorney's office and whether screening with an "ethical wall" can prevent the vicarious disqualification. Were we concerned with a private law firm, the answer would be clear: Knecht's disqualification would be mandatory and would extend to her entire law firm. (*SpeeDee Oil Change, supra,* 20 Cal.4th at p. 1146.) But Knecht is employed by a public law office, not a private law firm.

■ California courts have long recognized that public sector attorneys have the same ethical duties of confidentiality and loyalty as their counterparts in the private sector. However, the interests at stake are different, and so are the rules governing vicarious disqualification of a public law office. Unlike their private sector counterparts, public sector lawyers do not have a financial interest in the matters on which they work. As a result, they may have less, if any, incentive to breach client confidences. (*Chadwick v. Superior Court, supra,* 106 Cal.App.3d at p. 117.) Public sector lawyers also do not recruit clients or accept fees. As a result, they have no financial incentive to favor one client over another. (*Castro v. Los Angeles County Bd. of Supervisors, supra,* 232 Cal.App.3d at p. 1441.)

Courts have also recognized that vicarious disqualification in the public sector context imposes different burdens on the affected public entities, lawyers and clients. Most frequently cited is the difficulty public law offices would have in recruiting competent lawyers. Private sector law firms may hesitate to hire a lawyer from a public law office, to avoid being disqualified in future matters involving that office. Individual lawyers may hesitate to accept public sector jobs, to avoid limiting their future opportunities in the private sector. (*Chambers v. Superior Court, supra,* 121 Cal.App.3d at p. 899.) Clients whose interests are adverse to a public entity could be deprived of their chosen counsel, or find it difficult to retain counsel at all, particularly in highly specialized areas of the law. (*Ibid.*) Public entities may face the same difficulty and be forced to avoid hiring lawyers with relevant private sector experience. Disqualification increases costs for public entities

just as it does for private sector litigants. When a public entity is involved, these higher costs raise the possibility that litigation decisions will be driven by financial considerations rather than by the public interest. (*In re Lee G.* (1991) 1 Cal.App.4th 17, 28 [1 Cal.Rptr.2d 375].)

In light of these considerations, courts have more readily accepted the use of screening procedures or ethical walls as an alternative to vicarious disqualification in cases involving public law offices. For example, *Chambers v. Superior Court, supra*, 121 Cal.App.3d 893, held that a private law firm was not vicariously disqualified from representing a plaintiff in litigation against the state's Department of Transportation after the firm hired a lawyer previously employed by the state to represent that department in other, similar lawsuits. The lawyer did not discuss or involve himself in any cases on which he worked or about which he acquired any knowledge during his state employment. There was no evidence that he used information acquired from his state employment in a manner that was adverse to the state. (*Id.* at p. 895.) In ruling against vicarious disqualification of the lawyer's new law firm, the court noted that, when he was employed by the state, the lawyer had acquired no confidential information about the pending lawsuit. (*Id.* at p. 903.) It concluded that an ethical screen was sufficient to prevent the lawyer from participating in the lawsuit. (*Ibid.*)

An ethical screen may also suffice when a lawyer moves between public law offices. For example, in *Chadwick v. Superior Court, supra*, 106 Cal.App.3d 108, a lawyer left his job at the county public defender's office to work for the district attorney on juvenile matters. The lawyer would have no connection with cases he handled as a public defender and had sworn not to discuss his former cases and clients with other prosecutors. His office was in a separate building and he was not supervising or supervised by anyone who had contact with the prosecution of his former clients. (*Id.* at pp. 112–113.) The court declined to disqualify the district attorney's office from prosecuting the lawyer's former clients, concluding that screening would be sufficient to protect their confidential communications. (*Id.* at p. 118 [164 Cal.Rptr. 864].)

*Castro v. Los Angeles County Bd. of Supervisors, supra*, 232 Cal.App.3d 1432, reached a similar result, holding that rigorous screening procedures would permit a single nonprofit public benefit corporation, Dependency Court Legal Services, Inc. (DCLS), simultaneously to represent all parties at dependency proceedings. Even though counsel were employed by the same corporation and represented adverse interests in the same matters, the arrangement did not create unacceptable conflicts of interest. DCLS established separate practice groups to represent indigent parents, children and the

county. A single administrative unit provided payroll and accounting services for the entire entity, but the practice groups had separate offices, filing and computer systems, supervisors and support staff. Lawyers within a practice group had access only to confidential information maintained by that group. No one had access to the other practice groups. The court concluded these measures would prevent disclosure of confidential information between practice groups and declined to enjoin the operation of DCLS. (*Id.* at p. 1445; see also *People v. Christian* (1996) 41 Cal.App.4th 986, 998–999 [48 Cal.Rptr.2d 867] [ethical walls screening lawyers in public defender's office from those in the alternate public defender's office sufficient to avoid conflicts of interest, despite offices' shared administrative unit].)

■ Government lawyers are not, of course, entitled to ignore conflicts of interest. The court in *Civil Service Com. v. Superior Court* (1983) 163 Cal.App.3d 70 [209 Cal.Rptr. 159], held that county counsel was disqualified from representing the county in litigation against its own civil service commission because the same attorney from that office had provided pre-litigation advice to both the county and the commission. (*Id.* at p. 81.) The court rejected a contention that an ethical screen between advisory and litigation divisions within the county counsel's office would resolve the conflict. "The problem here is not so much in screening the litigators from the advisors but rather in screening attorneys representing the Commission from attorneys representing the County. . . . [¶] Moreover, the 'screening' process has been suggested only in very limited circumstances where an attorney, disqualified from participation in a case as a result of his prior employment, is 'sealed off' from the rest of his new law firm to avoid disqualification of that firm. [Citations.] Here, the Commission's relationship with county counsel is not limited to a single attorney who previously represented the Commission while employed by another firm. The Commission's ongoing relationship with the entire office of county counsel, including [the individual lawyer representing the County in the litigation] makes any attempted screening device inappropriate." (*Id.* at p. 81 & fn. 5.)[3]

In the present case, there are circumstances that suggest an ethical wall would not sufficiently protect the Stensons' confidences. Unlike the lawyer at issue in *Chambers v. Superior Court, supra,* 121 Cal.App.3d 893, Knecht was directly and personally involved in Hatch & Parent's representation of the

---

[3] Our Supreme Court recently granted review in *City & County of San Francisco v. Cobra Solutions, Inc.* (2004) 119 Cal.App.4th 304 [14 Cal.Rptr.3d 400], where the Court of Appeal held ethical screening insufficient to prevent the vicarious disqualification of a city attorney's office in all matters substantially related to the elected city attorney's earlier private representations. (*City and County of San Francisco v. Cobra Solutions, Inc.* rev. granted Aug. 25, 2004, S126397.)

Stensons. She received confidential information from them and performed legal services for them on the pending matter. The ethical wall constructed here is also more informal than those at issue in *Castro v. Los Angeles County Bd. of Supervisors, supra,* 232 Cal.App.3d 1132, and *People v. Christian, supra,* 41 Cal.App.4th 986. Knecht and McGinnis work in the same building, are supervised by the same City Attorney, and use the same computers and administrative services.

Other circumstances suggest, however, that the ethical wall will be effective. First, as the Stensons acknowledge, no breaches have occurred thus far. Employees in the city attorney's office have been instructed to have no communications with Knecht concerning this matter. Knecht has received the same instruction and also has no contact with McGinnis, the lawyer who is working on this case. She has no managerial or supervisory responsibilities and does not appear to be in a position to influence her colleagues' performance evaluations or city policy with respect to this case or any other litigation. Similarly, McGinnis has no managerial or supervisory authority over Knecht. The two lawyers do not attend staff meetings together. Knecht does not have access to files concerning this matter which are stored separately from the nonlitigation files she uses. Finally, as important as this matter must be to the parties involved in it, we doubt whether it has garnered much media attention or captured the public imagination. As a result, the use of an ethical screen will be less likely to erode public confidence in the administration of justice, the integrity of the bar or the professionalism of the city attorney's office.

## Conclusion

On balance, we conclude that the personal disqualification of Knecht does not require the vicarious disqualification of the entire city attorney's office. The screening measures established by the city attorney are both timely and effective in protecting the Stensons' confidences.

Like all attorneys, Knecht knows that her participation and use of confidential information against a former client would subject her to a host of problems including tort liability and state bar discipline. Such conduct would be a recipe for financial and professional suicide. We are confident that an attorney's oath and the severe consequences that would inexorably flow from a breach thereof, coupled with the instant "ethical wall," are sufficient to safeguard the former clients' confidences and preserve the integrity of the judicial process.

Let a peremptory writ of mandate issue, commanding the trial court to vacate its order disqualifying the city attorney's office from representing the City in this action and to enter a new order denying the motion to disqualify. The order to show cause, having served its purpose, is discharged. Costs to petitioner. (Cal. Rules of Court, rule 56.)

Gilbert, P. J., and Coffee, J., concurred.