Filed 8/19/24

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| KIMBERLY SYRE,<br><br>    Plaintiff, Cross-defendant and Appellant,<br><br>v.<br><br>MARK DOUGLAS,<br><br>    Defendant, Cross-complainant and and Respondent. | E080594<br><br>(Super.Ct.No. ICSICVCV202268113)<br><br>OPINION |

APPEAL from the Superior Court of Inyo County. Stephen M. Place, Judge. Affirmed.

Law Offices of Brian Lamb, and Brian Lamb for Plaintiff, Cross-defendant and Appellant.

California Indian Legal Services, Rachel Leiterman and Michael Godbe, for Defendant, Cross-complainant and Respondent.

Zachary Newman for Legal Aid Association of California as Amicus Curiae on behalf of Defendant, Cross-complainant and Respondent.

1

Plaintiff Kimberly Syre appeals from an order denying her motion to disqualify California Indian Legal Services (CILS) who represents defendant Mark Douglas. Plaintiff contacted CILS seeking representation prior to filing her lawsuit for quiet title against defendant, but after a telephone conversation with a CILS intake advocate, CILS declined to represent plaintiff due to non-residency in Inyo County. Plaintiff sought other counsel and filed a quiet title lawsuit against defendant, who successfully sought representation from CILS.

On appeal, plaintiff asserts the trial court misconstrued the California Rules of Professional Conduct[1] and that its erroneous legal conclusions require reversal. We affirm the judgment.

## BACKGROUND

### A. *Background of the Underlying Litigation*

Plaintiff is the niece of the late Charlotte Willett (Willett), owner of real property in the city of Bishop, Inyo County, California. Defendant is Willett's son, who is homeless and lacks a source of income. In June 2008, Willett established a living trust, "Charlotte A. Willett Trust dated June 14, 2008," (Trust) into which Willett transferred the real property. At the time, Willett was not in communication with defendant; Willett wanted to transfer her real and personal property to defendant but wanted him to be clean of drugs and alcohol first.

---

[1] All further rule references are to the California Rules of Professional Conduct, which incorporated the American Bar Association (ABA) model rule 1.18, although the concepts of the ABA rule are spread out over several rules (rules 1.7-1.9, & 1.18).

Until 2013, Willett had rented out her property and resided in a mobile home. The renters had mistreated Willet's property, requiring extensive repairs and work. At plaintiff's suggestion, Willett sold the mobile home and resumed residence in her property. Plaintiff offered to help Willett with the cost of repairs in return for a half-interest in Willett's property. Willett executed a grant deed transferring the real property from herself to both Willett and plaintiff as joint tenants; the deed was recorded. The grant deed did not refer to the property being in a trust. The intent was that Willett would continue to reside on the property for the rest of her life. Willett's Trust was amended to name plaintiff as successor trustee, with instructions to distribute 50 percent of the Trust to defendant.

In return for the interest in the property, plaintiff was to pay $100,000 to Willett, with $30,000 to be deposited into Willett's checking account and $70,000 into a joint savings account, under the names of Willett and plaintiff, for which Willett was to have a bank card to access the funds. Plaintiff also was responsible for paying the property taxes and homeowners' insurance. However, the bank card provided to Willett had only plaintiff's name on it preventing Willett from receiving any funds deposited into Willett's savings account, and Willett received a statement from the tax collector indicating the property taxes had not been paid.

In late 2019, Willett was still unable to access the money in the accounts, and plaintiff stopped responding to Willett's phone calls and text messages, causing the relationship to sour. When plaintiff did answer one call, plaintiff was loud, used abusive

language, and threatened to charge Willett rent or evict her from the property. Willett, upset by plaintiff's abusive treatment, called her cousin, Pauline Adams and her close friend Margery Hammer, informing them of these developments. Willett decided to remove plaintiff from Willett's Trust, and to seek a way to change the deed on her property to remove plaintiff's name.

In 2020, Willett fell, sustaining fractures to her leg and foot. Willett expressed to Adams her disappointment that plaintiff never attempted to contact Willett regarding her rehabilitation, and told Adams that she felt that plaintiff was just waiting for Willett to die to get Willett's property. That same year, Willett expressed the intent to change her Trust and asked Adams to be the trustee.

Even before reuniting with defendant, Willett also expressed to Adams that she wished all her property to go to defendant, especially her personal property. Willett was aware she could not transfer her interest in the property to defendant without plaintiff's knowledge. In 2021, Willett started the process of amending her Trust in favor of defendant, even before she reunited with him. Willett named Adams as successor trustee, removing plaintiff's name. Willet's estate attorney, Linda Hess, advised Willet that she could break the joint tenancy by transferring her one-half interest by way of a grant deed and made other modifications to effectuate Willett's intentions. Defendant was unaware of the changes being made in his favor.

In March or April 2021, defendant contacted Willett to inform her that he was clean and sober. Early in 2021, Willett, who felt betrayed by plaintiff and desired to

4

provide for defendant, modified her Trust to transfer all her personal property and her interest in the real property to defendant, removing plaintiff from her Trust. The modified trust instrument expressly provided that the trustee should transfer all of Willett's interest in the property, as well as all her personal property, to defendant. Willett also executed a grant deed transferring her interest in the property to defendant, although this deed omitted reference to the Trust. The grant deed was recorded on May 11, 2021. This deed also indicated that Willett was conveying the property as an individual, rather than trustee.

Willett and defendant maintained a strong relationship until Willett's death. Willett was diagnosed with terminal lung cancer in May 2021 and died in June. Shortly before her death, Willett directed Hess to modify the Trust again, instructing Hess to transfer $10,000 to defendant, but Willett died before being able to execute the document.

Following Willett's death, and while defendant was away, plaintiff entered the property and changed all the locks. When defendant attempted to gain entry to the property upon his return, he was told he was not permitted to do so, and that plaintiff had threatened to have defendant arrested if he returned. Later, defendant learned that plaintiff had been selling many personal property possessions—some of which were defendant's own possessions—to third parties, and that plaintiff considered a trailer that was located on the property to be hers. Among the items to which defendant has been denied access are his art supplies, which has prevented him from pursuing his livelihood of selling his artwork.

5

On July 6, 2022, plaintiff filed a complaint for quiet title against defendant and Adams as the successor trustee. On August 8, defendant answered the complaint, and filed a cross-complaint for (1) quiet title, (2) conversion, (3) trespass to chattels, and (4) declaratory relief. Defendant also sought injunctive relief to enjoin plaintiff from preventing defendant's entry to or possession of the property, or the sale of property belonging to defendant.

Plaintiff sought multiple stays of the proceedings prior to complete discovery on a potential conflict of interest of CILS, which were granted. On November 30, 2022, plaintiff filed a motion to disqualify defendant's counsel of record, CILS, alleging that CILS had a conflict of interests stemming from plaintiff's attempt to obtain legal representation by that public law office.[2] The motion also sought a further stay of proceedings pending a ruling. Defendant opposed the motion.

On January 16, 2023, the trial court denied the motion to disqualify CILS, but continued the stay of proceedings through January 24, to allow time to file an appeal. On January 27, plaintiff appealed the ruling.

B. *Facts Pertinent to the Disqualification Motion*

On July 2, 2021, plaintiff called CILS's office and spoke to an intake advocate, a person who is not an attorney, and whose primary duties include answering the telephone.

---

[2] Additional facts relating to the issue are set out below.

6

CILS is a grant-funded law office providing legal services to qualified individuals.[3]  It does not ordinarily represent clients who own real property in title disputes, or who reside outside of Inyo County.  For this reason, before accepting a case, CILS obtains preliminary information from prospective clients to determine if they are eligible for the grant-funded services.  Intake advocates are trained to inform prospective clients that their case cannot be accepted unless and until their issue has been discussed at a "Case Acceptance Meeting."

Plaintiff, represented by attorney Brian Lamb, filed a quiet title complaint on July 6, 2022, and it was served on defendant the same day.  On April 5, after being served with plaintiff's complaint, defendant contacted CILS for legal assistance in obtaining recognition of his rights respecting real property in Bishop, bringing documents, including grant deeds, transferring all or part of the title to the real estate to him.  Attorney Michael Godbe had no recollection of plaintiff's name or her contact with the

---

[3]     According to the CILS website, one of the questions under "Frequently Asked Questions" was "How do I qualify for CILS service" and the answer stated as follows: "CILS provides representation in areas of federal Indian law, with the exception of our Bishop CILS Office.  CILS can provide free representation to individuals who are at or below the federal poverty level.  To determine if you are eligible for free services, you will need to meet with the Intake Specialist in the CILS office that serves your county.  In limited cases and depending upon the legal question, if an individual does not qualify for free services, CILS may represent clients in a fee-for-service capacity at a lower-than-market rate."  (https://www.calindian.org/faq/ as of February 9, 2024.)  CILS's funding is limited to representation of Native Americans and Tribal representation with exception of the Bishop field office, however, even when CILS cannot represent a person, it may be able to "provide general information and/or referrals to outside agencies or practitioners that may be helpful."  (*Ibid.*)

CILS office, and the intake advocate who had spoken to plaintiff had not worked for CILS for over five months, since September or October 2021.

When contacted by defendant, CILS attorney Rachel Leiterman investigated the possibility of undue influence in the execution of the deeds by contacting Willett's estate attorney Hess, who assured CILS that the documents reflected Willett's true intent, without undue influence. Defendant was eligible for CILS's representation because of CILS's homelessness prevention grant funding and because defendant lived in the city of Bishop.

On May 3, 2022, Leiterman sent a letter to plaintiff demanding that defendant be given possession of the property in question. Leiterman began working at CILS in February 2022, so she was not an employee in 2021. In response to the demand letter, plaintiff's counsel Lamb contacted CILS to inform Leiterman that he represented plaintiff, and that there was a possible disqualification issue because plaintiff had contacted CILS in July 2021, and that plaintiff had been declined representation because she did not live in the city of Bishop.

However, the CILS case management system and its email system had no record of any contact by plaintiff, and no current attorney at CILS had any recollection of speaking with plaintiff. The absence of client intake information in the case management system indicated that the process had not been completed because the person was ineligible for services from CILS.

8

The day after the contact from plaintiff's counsel, a CILS employee found a record of a contact from an unnamed person under "other legal service," in which the intake advocate noted, "Housing issue with cousin. Referred to another legal aid office." Although plaintiff's name was not on this record, it was deduced that this record must pertain to the call by plaintiff, because the date of the record coincided with the dates provided by attorney Lamb in his communication with CILS.

Attorney Godbe was the only current employee who worked at the Bishop CILS office between July 2021 and May 2022, when plaintiff's counsel contacted CILS, but he had no recollection of plaintiff's name or her contact with CILS. For approximately one month, he assumed the "other legal service" record was the only reference to plaintiff's contact with CILS. However, in June 2022, he extended his search to deleted emails not ordinarily included in a default email search, and there he found an email exchange from July 2021 between himself, the directing attorney Dorothy Alther for CILS,[4] and the intake advocate who had taken the call from plaintiff.

The email exchange revealed that because the real property that plaintiff was calling about was located in Bishop, within the CILS service territory, the intake advocate had obtained preliminary information about the dispute. (See fn. 2.) The intake advocate emailed CILS attorney Godbe regarding the conversation with plaintiff, as is the usual practice, to determine if the caller seeking representation meets the financial criteria for representation and to determine if the type of case falls under their public services grants.

---

[4] In July 2021, Dorothy Alther was the Executive Director of CILS working in Escondido, but in 2022, she was the Legal Director of all CILS offices.

The intake advocate's first email to attorney Godbe indicated plaintiff lived in Tustin, but the property was in Bishop, and asked if that would be in their territory. Godbe responded "Usually we go off where people live, so that would be Escondido. But what's the issue re property in Bishop?"

In response, the intake advocate wrote, "She grew up in Bishop … and had an aunt that owned a house. She bought the house from her aunt before her Aunt [Willet] died, so told her Aunt that she could live in the house for as long as she wants. Her relative [the defendant] forced their aunt into signing the deed which would make [defendant] co-owner with [plaintiff]. The defendant is in Inyo County jail right now; he's a felon and was arrested for being in possession of firearms and drugs (4 counts total). She is coming to Bishop and has talked to the Sheriff about a restraining order because she is afraid of him. He also forced the Aunt to take her name off of her trust and put it into his name. The Aunt was supposed to go to the Care Center but died prior to going. She didn't have a caregiver but there were people that looked in on her. [¶] She owns a house in Tustin, CA and the Mortgage payments are $3200.00 per month; she has no income right now and was getting a grant to pay her mortgage payments. She has $20,000 in her checking about [sic] which won't last long. She has car payment of $832 per month which was also being subsidized by the state. [¶] I believe she would be eligible for a CAT 6a."

Godbe's email to Alther reflects that plaintiff was referred to the legal aid office in Orange County because she did not live in Bishop and was not eligible under "either cat 5 or 6 if she lives out of the area" and that plaintiff was trying to prove Willett changed

10

documents due to undue influence, which was an uphill battle. Alther responded by email that she agreed with Godbe. Godbe then advised the intake advocate to inform plaintiff she was not eligible for CILS's services and to refer her to another legal aid organization. No staff attorney at CILS spoke to plaintiff.

## DISCUSSION

Plaintiff argues the trial court erroneously denied her motion to disqualify CILS by misconstruing rule 1.18. Because the interpretation of the rule involves a question of rule construction, we apply the *de novo* or independent standard of review. However, the question of whether to grant or deny such a motion involves the exercise of the trial court's broad discretion, which we review under the abuse of discretion standard.

a. ***Standard of Review***

""'Generally, a trial court's decision on a disqualification motion is reviewed for abuse of discretion.'"" (*Doe v. Yim* (2020) 55 Cal.App.5th 573, 581, quoting *In re Charlisse C.* (2008) 45 Cal.4th 145, 159 (*Charlisse C.*), see *Victaulic Co. v. American Home Assurance Co.* (2022) 80 Cal.App.5th 485, 504-505, quoting *People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1143 (*SpeeDee Oil*).) "Under this standard, the trial court's legal conclusions are reviewed de novo, but its factual findings are reviewed only for the existence of substantial evidence supporting them, and its "'application of the law to the facts is reversible only if arbitrary and capricious.'"" (*Doe v. Yim*, *supra*, at p. 581, quoting *Charlisse C.*, *supra*, at p. 159.)

11

"When substantial evidence supports the trial court's denial of a motion to disqualify counsel, 'an appellate court must uphold that decision.'" (*Capra v. Capra* (2020) 58 Cal.App.5th 1072, 1092 (*Capra*), quoting *Toyota Motor Sales, U.S.A., Inc. v. Superior Court* (1996) 46 Cal.App.4th 778 (*Toyota Motor Sales*). "Credibility, even when based upon conflicting declarations, is determined by the trial court." (*Toyota Motor Sales*, *supra*, at p. 783.) "Conflicts in the declarations are resolved in favor of the prevailing party and the trial court's resolution of factual issues arising from competing declarations is conclusive on the reviewing court." (*H.F. Ahmanson & Co. v. Salomon Bros.* (1991) 229 Cal.App.3d 1445, 1451 (*H.F. Ahmanson & Co*).)

Thus, an order or judgment of the trial court is presumed correct, "all intendments and presumptions are indulged to support the judgment, conflicts in the declarations must be resolved in favor of the prevailing party, and the trial court's resolution of any factual disputes arising from the evidence is conclusive." (*McMillan v. Shadow Ridge at Oak Park Homeowner's Assn.* (2008) 165 Cal.App.4th 960, 965, citing *Koo v. Rubio's Restaurants, Inc.* (2003) 109 Cal.App.4th 719, 728.)

b. ***General Principles Governing Attorney Disqualification for Conflict of Interests***

The authority of a trial court "to disqualify an attorney derives from the power inherent in every court '[t]o control in furtherance of justice, the conduct of its ministerial officers.'" (*SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1145, quoting Code Civ. Proc., § 128, subd. (a)(5); *Capra*, *supra*, 58 Cal. App. 5th at p. 1092.)

It has long been the rule that a "former client may seek to disqualify a former attorney from representing an adverse party by showing the former attorney actually possesses confidential information adverse to the former client." (*H. F. Ahmanson & Co.*, *supra*, 229 Cal.App.3d at p. 1452.) Actual possession of confidential information need not be proved in order to disqualify the former attorney; it is enough to show a "substantial relationship" between the former and current representation. (*Global Van Lines, Inc. v. Superior Court* (1983) 144 Cal.App.3d 483, 489.) Plaintiff was not a former client.

However, after the California Supreme Court adopted ABA model rule 1.18 in November 2018, there is now also a duty to prospective clients. That rule provides: "(a) A person*[5] who, directly or through an authorized representative, consults a lawyer for the purpose of retaining the lawyer or securing legal service or advice from the lawyer in the lawyer's professional capacity, is a prospective client.

"(b) Even when no lawyer-client relationship ensues, a lawyer who has communicated with a prospective client shall not use or reveal information protected by Business and Professions Code section 6068, subdivision (e) and rule 1.6 that the lawyer learned as a result of the consultation, except as rule 1.9 would permit with respect to information of a former client.

"(c) A lawyer subject to paragraph (b) shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the

_____

[5]     Asterisks (*) in the original identify a word or phrase defined in the terminology rule, Rule 1.0.1. All asterisks are found in the original.

13

lawyer received from the prospective client information protected by Business and Professions Code section 6068, subdivision (e) and rule 1.6 that is material to the matter, except as provided in paragraph (d). If a lawyer is prohibited from representation under this paragraph, no lawyer in a firm* with which that lawyer is associated may knowingly* undertake or continue representation in such a matter, except as provided in paragraph (d).

"(d) When the lawyer has received information that prohibits representation as provided in paragraph (c), representation of the affected client is permissible if:

"(1) both the affected client and the prospective client have given informed written consent,* or

"(2) the lawyer who received the information took reasonable* measures to avoid exposure to more information than was reasonably* necessary to determine whether to represent the prospective client; and

"(i) the prohibited lawyer is timely screened* from any participation in the matter and is apportioned no part of the fee therefrom; and

"(ii) written* notice is promptly given to the prospective client to enable the prospective client to ascertain compliance with the provisions of this rule."

The rule therefore modifies the rules of professional conduct to provide protections against the use of confidential information obtained by an attorney in the course of an initial consultation. (Rule 1.18(b).) It further provides that a lawyer "shall not represent a client with interests materially adverse to those of a prospective client in

14

the same or a substantially related matter if the lawyer received from the prospective client" confidential information (rule 1.18(c)), and if a lawyer is prohibited from representation under the rule, "no lawyer in a firm* with which that lawyer is associated may knowingly* undertake or continue representation in such a matter, except as provided in paragraph (d)." (Rule 1.18(c).)

Comment 1 to rule 1.18 indicates that a prospective client is not elevated to the same status as a current or former client, insofar as "Although a prospective client's information is protected by Business and Professions Code section 6068, subdivision (e) and rule 1.6 the same as that of a client, in limited circumstances provided under paragraph (d), a law firm* is permitted to accept or continue representation of a client with interests adverse to the prospective client." (Rule 1.18, Comment [1], asterisk in original.)

Comment 2 to rule 1.18 states that "[a] person* who by any means communicates information unilaterally to a lawyer, without reasonable* expectation that the lawyer is willing to discuss the possibility of forming a lawyer-client relationship or provide legal advice is not a 'prospective client.'" (Rule 1.18, Comment [2].)

c. *Analysis*

There is a paucity of decisional law interpreting rule 1.18, but the obvious thrust of the rule is to protect information provided by a prospective client against disclosure to third parties or being made public, as indicated by the plain language of the rule. "ABA Model Rule 1.18 bars disclosure of confidential information 'except as Rule 1.9 would

permit with respect to information of a former client.' The primary difference between the rules is that representation is not barred by ABA Model Rule 1.18 unless 'the lawyer received information from the prospective client that could be significantly harmful to that person in the matter.'" (*Factory Mutual Insurance Co. v. APComPower, Inc.* (W.D.Mich. 2009) 662 F.Supp.2d 896, 898 (*Factory Mutual Ins. Co.*).)

Here, the incorporation of the new rule extended certain protections, but still required plaintiff to establish that (a) she was a prospective client, (b) that she communicated confidential information to an attorney and (c) the confidential information was either made public or disclosed to a third party. We note that with respect to former clients, there is a conclusive presumption of knowledge of confidential information that has been justified as a rule of necessity, "'for it is not within the power of the former client to prove what is in the mind of the attorney.'" (*H. F. Ahmanson & Co., supra*, 229 Cal.App.3d at p. 1453.) The presumption that the attorney possesses confidential information arises where a substantial legal and factual relationship exists between a former representation and the attorney's current position, which would be compromised if an attorney were allowed to take an adverse position after the representation ended. (*Styles v. Mumbert* (2008) 164 Cal.App.4th 1163, 1167, and cases cited.)

Interestingly, neither Business and Professions Code section 6068, nor the Rules of Professional Conduct define what is "confidential information." The Evidence Code defines "'confidential communication between client and lawyer'" as "information

transmitted between a client and his or her lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted, and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship."  (Evid. Code, § 952.)

Rule 1.6 provides, "A lawyer shall not reveal information protected from disclosure by Business and Professions Code section 6068, subdivision (e)(1) unless the client gives informed consent, (*) or the disclosure is permitted by paragraph (b) of this rule."  (Rule 1.6(a).)  In turn, the relevant provision of the Business and Professions Code provides that an attorney is required to "[t]o maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client."  (Bus. & Prof. Code, § 6068, subd. (e)(1).)  We turn to decisional authority for further clarification.

"'Confidential communication' is defined as including 'a legal opinion formed and the advice given by the lawyer in the course of that [attorney-client] relationship.' (Evid. Code, § 952.)"  (*Roberts v. City of Palmdale* (1993) 5 Cal.4th 363, 371.)  Under the Evidence Code, "the attorney-client privilege applies to confidential communications within the scope of the attorney-client relationship even if the communication does not relate to pending litigation; the privilege applies not only to communications made in anticipation of litigation, but also to legal advice when no litigation is threatened."

17

(*Roberts*, *supra*, at p. 371, citing *Hoiles v. Superior Court* (1984) 157 Cal.App.3d 1192, 1198, and *Southern Cal. Gas Co. v. Public Utilities Com.* (1990) 50 Cal.3d 31, 39-40 [discussing implied waiver of the attorney-client privilege where privileged communications are placed in issue by client].)

This definition does not cover prospective clients, and there are no cases, statutes, or rules defining the type of communication between a prospective client and an attorney that could be considered confidential when the information acquired in the communication is geared at deciding whether to form the attorney-client relationship at all. Rule 1.6 itself informs us that in a prospective client situation, not all information is confidential. However, there is no statutory or rule definition of the term in the context of prospective clients to differentiate the type of preliminary information needed by an attorney to make the determination whether to accept a case or not and the type of information exchanged in an attorney-client relationship. Reference by the Business and Professions Code section 6068, subdivision (e) to client "secrets" suggests that not all information acquired by an attorney is confidential.

To be sure, certain information obtained from a client during the course of representation is required to be revealed in a pleading seeking legal relief, filed in a tribunal. However, as indicated, a prospective client is not elevated to the status of a former client and representation of a new client is not barred unless the attorney obtained information from the prospective client that could be significantly harmful to that person in the matter. (Rule 1.18, Comment [1]; *Factory Mutual Ins. Co.*, *supra*, 662 F.Supp.2d

18

at p. 898.) Moreover, as will be demonstrated, a motion to disqualify a public interest law office is treated differently from such motions directed at private attorneys or law firms.

As to the first requirement, we conclude that plaintiff was a prospective client, despite not communicating directly to an attorney, but that there was no reasonable expectation that CILS was willing to discuss the possibility of forming a lawyer-client relationship or provide legal advice unless or until plaintiff met the eligibility criteria for representation by CILS. The unrefuted evidence provided by CILS demonstrates that plaintiff spoke only to an intake advocate employed by CILS, who was not an attorney, and who was trained to inform prospective clients that their case cannot be accepted unless and until their issue has been discussed at a "Case Acceptance Meeting." The intake form and the information requested thereon is a standardized intake form used by all legal aid offices throughout the state.[6] Thus, plaintiff was aware that obtaining representation by CILS required the communication of preliminary information about the "issue" to determine if the case was appropriate under the CILS grants.

Second, the only information communicated by plaintiff to the CILS intake advocate that could be viewed as confidential would have been her financial information, needed to determine her eligibility for representation. However, the communication of

[6] We granted leave to file an amicus brief by the Legal Aid Association of California (LAAC), a statewide association of over one hundred public interest law nonprofits. LAAC reaffirmed the specialized need of public interest law offices to obtain certain information necessary to the determination of eligibility for services, and described the intake process and questions of CILS as standard.

19

that information was necessary to determine if she was eligible for the services of CILS in the first place, and there is no evidence it was communicated to a third party or made public. Further, it was unlikely plaintiff's financial information would be disclosed to third persons or to the public because none of the issues raised in the quiet title action depended on that information. There is no showing or finding that the confidential information was either made public or disclosed to a third party, such as would disqualify CILS from representing defendant.

As to the remaining information communicated to CILS, the case information provided by plaintiff was preliminary information about the nature of the dispute (whether defendant exercised undue influence on Willet to induce her to convey her real and personal property to him (who was the natural object of her bounty).[7] In this regard, matters of title to real property are public record and all the transfers referred to in the complaint and cross-complaint involve records that were either recorded or notarized in front of witnesses, and were matters of public record. (See 4 Cal. Real Estate Law & Practice § 92.12 (2024).) As for the information regarding plaintiff's statements that defendant exercised undue influence on Willet, that information could not be viewed as confidential where it related to the theory of recovery she intended to pursue, and which would have been disclosed in the pleadings. The case-related information was not

---

[7] "The expression 'natural objects of the testator's bounty' refers to the descendants, surviving spouse, and parents of the testator, who, purely by reason of that relationship, may be assumed to have had claims on the testator's bounty." (64 Cal. Jur.3d (2024) Wills, § 144.)

confidential, did not risk any harm to plaintiff, and was not material to her action to quiet title, although some of the information was, in fact, included in her quiet title action.

Therefore, it cannot be said that the information that was communicated to the intake advocate, as relayed to those responsible for the decision whether or not to accept plaintiff's case, was confidential in nature, much less harmful to plaintiff. Plaintiff relayed to the intake advocate her concerns that defendant had exercised undue influence on Willet, which, it turned out, was the same concern independently entertained by CILS when consulted by defendant, prior to the public law firm's acceptance of his case.

We cannot consider communication of the nature of plaintiff's anticipated action against defendant to be confidential information where plaintiff was seeking representation in anticipation of filing a lawsuit based on that information in court. Plaintiff's cause of action alleges that any transfer of the title to the property in question is "void ab initio" without referring to any deed in favor of defendant, while also alleging that defendant is an ex-felon whose testimony in court would be subject to impeachment. It does not require prescience to predict that the basis of these allegations would be explored in discovery in this litigation. Plaintiff cannot reasonably assert that the preliminary information about the "issue" in the case was a confidential communication.

Additionally, we cannot overlook the fact that a publicly funded nonprofit legal services provider like CILS is treated like a public law office (see *Charlisse C.*, *supra*, 45 Cal.4th at pp. 162-163 [declining to apply the automatic rule of vicarious disqualification to the Children's Law Center, a publicly funded nonprofit corporation]), and that plaintiff

21

is not a former client, to whom a higher duty is owed. Even in the context of former clients, "California courts have generally declined to apply an automatic and inflexible rule of vicarious disqualification in the context of public law offices. Instead, in this context, courts have looked to whether the public law office has adequately protected, and will continue to adequately protect, the former client's confidences through timely, appropriate, and effective screening measures and/or structural safeguards." (*Id*. at p. 162.)

As amicus curiae notes, if legal aid law offices were prohibited from obtaining intake information as to the prospective client's financial eligibility and as to the nature of the case, the nonprofits would risk losing grants and other funding dependent on the use of funding to represent only eligible clients.[8] There was no showing in the present case that CILS employed inadequate protections, screening measures or structural safeguards respecting persons it has represented or is representing concurrently with the later client.

Plaintiff's claim of disqualification also failed to establish a substantial relationship with CILS from which she could reasonably expect that preliminary information about the case would be considered confidential. Demonstrating a "substantial relationship" is a necessary requirement, even where an attorney-client relationship has been established. In cases involving successive representation, the

---

[8] At oral argument, counsel for plaintiff argued that because defendant claimed an ownership interest in the real estate, he was similarly ineligible for representation by CILS. However, plaintiff had unilaterally prevented defendant from entering or gaining access to even his personal property, by which he earned income, leaving him homeless and without means to earn money. Thus, plaintiff's own actions made defendant eligible for representation by the public interest law office.

primary value at stake is client confidentiality, so the correct legal standard generally requires disqualification of the attorney if "the [former] client demonstrate[s] a '*substantial relationship*' between the subjects of the antecedent and current representations." (*Charlisse C.*, *supra*, 45 Cal.4th at p. 161, quoting *Flatt v. Superior Court* (1994) 9 Cal.4th 275, 283.) In the context of public law offices, where one attorney in a public law office has a conflict of interest with a former or concurrent client, automatic disqualification of the entire office (vicarious disqualification) is not required. As explained in *City of Santa Barbara v. Superior Court* (2004) 122 Cal.App.4th 17, 24-25 (*Santa Barbara*):

"California courts have long recognized that public sector attorneys have the same ethical duties of confidentiality and loyalty as their counterparts in the private sector. However, the interests at stake are different, and so are the rules governing vicarious disqualification of a public law office. Unlike their private sector counterparts, public sector lawyers do not have a financial interest in the matters on which they work. As a result, they may have less, if any, incentive to breach client confidences. [Citation.] Public sector lawyers also do not recruit clients or accept fees. As a result, they have no financial incentive to favor one client over another. [Citation.]

"Courts have also recognized that vicarious disqualification in the public sector context imposes different burdens on the affected public entities, lawyers and clients. Most frequently cited is the difficulty public law offices would have in recruiting competent lawyers. Private sector law firms may hesitate to hire a lawyer from a public

23

law office, to avoid being disqualified in future matters involving that office. Individual lawyers may hesitate to accept public sector jobs, to avoid limiting their future opportunities in the private sector. [Citation.] Clients whose interests are adverse to a public entity could be deprived of their chosen counsel, or find it difficult to retain counsel at all, particularly in highly specialized areas of the law. [Citation.] Public entities may face the same difficulty and be forced to avoid hiring lawyers with relevant private sector experience. Disqualification increases costs for public entities just as it does for private sector litigants. When a public entity is involved, these higher costs raise the possibility that litigation decisions will be driven by financial considerations rather than by the public interest."

The above discussion from *Santa Barbara*, *supra*, 122 Cal.App.4th 17, pertained to former and concurrent clients actually represented by counsel in a public law office, and not to a prospective client who was found to be ineligible for representation at the screening and stage by a nonattorney. There, the court concluded that the rule of vicarious disqualification does not automatically apply to the entire firm based on previous representation by one attorney in the firm, unless "the attorney with the actual conflict has managerial, supervisorial, and/or policymaking responsibilities in a public law office, [where] screening may not be sufficient to avoid vicarious disqualification of the entire office." (*Charlisse C.*, *supra*, 45 Cal.4th at p. 163.) Because a higher duty is owed to former and current clients than prospective clients, the absence of evidence that

24

CILS employed ineffective screening procedures is another basis for finding there was no disqualifying conduct by the public law office.

Instead, "'courts have more readily accepted the use of screening procedures or ethical walls as an alternative to vicarious disqualification in cases involving public law offices.'" (*Charlisse C.*, *supra*, 45 Cal.4th at p. 163, citing *Santa Barbara*, *supra*, 122 Cal.App.4th at p. 25.) And, because plaintiff's case was never accepted by CILS, she could never establish which attorney with the CILS office was disqualified because she never consulted with an attorney. Because vicarious disqualification does not apply to all attorneys in a public law office, it would be impossible to determine which attorney, if any, was in possession of the confidential information, even if confidential information had been communicated.

Plaintiff was a prospective client only in the sense that she sought representation in her action against defendant. But the absence of evidence that CILS acquired confidential information, that was disclosed to third parties or made public, as well as the lack of evidence that a CILS attorney (as opposed to an intake advocate) obtained confidential information from the prospective client that could be significantly harmful to that person in the matter (rule 1.18, comment [1]; *Factory Mutual Ins. Co.*, *supra*, 662 F.Supp.2d at p. 898), demonstrates the court properly exercised its discretion in denying the motion to disqualify CILS.

The record reveals that if CILS were disqualified, defendant would be deprived of all legal representation due to the dearth of public interest law offices, such as CILS, in

the region. The facts of the alleged disqualification do not demonstrate a substantial relationship between plaintiff and any attorney at CILS, nor has she established that the preliminary information about the case communicated to the nonattorney intake advocate was a confidential communication, or that the information was disclosed to a third party or the public, or that the acquisition of the information by CILS harms plaintiff in any way.

The trial court did not abuse its discretion.

## DISPOSITION

The judgment is affirmed. Defendant is entitled to costs on appeal.

CERTIFIED FOR PUBLICATION

RAMIREZ
P. J.

We concur:

McKINSTER
J.

FIELDS
J.